JOSEPH YOUNG & another *vs.* THE ORPHEUS.
CHARLES W. LEWIS & another *vs.* SAME.
HENRY JONES *vs.* SAME.

Suffolk.    Nov. 12, 1874. — Nov. 27, 1875.    DEVENS, J., absent.

Under the St. of 1855, *c.* 231, no lien can be claimed for lumber furnished for the construction of a vessel, which has not been used in her construction, or fitted and prepared for that purpose.

Neither the fact that materials are furnished for the construction of a vessel on credit, nor the fact that they are delivered primarily on the credit of the builder of the vessel, defeats a lien under the St. of 1855, *c.* 231, if no note or security is taken, and exclusive credit is not given to the builder.

Under the St. of 1855, *c.* 231, § 2, a lien, for materials used in the construction of a vessel, is not dissolved by a clerical error, in the certificate filed in the office of the town clerk, in adding up the items of the account, which themselves clearly show the amount of the demand claimed and actually due    Nor is such lien dissolved by the including in the certificate of materials furnished for the vessel, but for which no lien in fact exists, they not having been used in her construction.

Under the St. of 1855, *c.* 231, § 2, declaring that a lien on a vessel shall be dissolved unless a certificate is filed " within four days from the time such ship or vessel shall depart from the port at which she was when the debt was contracted," the certificate may be filed before the vessel departs from the port.

The port of Boston is not limited to the municipal limits of Boston, but includes the opposite shore of Chelsea; and under the St. of 1855, *c.* 231, § 2, declaring that a lien on a vessel shall be dissolved unless a certificate is filed " within four days from the time such ship or vessel shall depart from the port at which she was when the debt was contracted, in the office of the clerk of the city or town within which such ship or vessel was at the time the debt was contracted," a vessel does not depart from the port by leaving, in an unfinished condition, the town of Chelsea, where she was when the debt was contracted. and going to Boston ; and a certificate filed, in Chelsea, more than four days after such leaving, and before she leaves Boston, is seasonably filed.

A vessel sailed from Boston in March, 1856, and did not return to any port of this Commonwealth until July, 1871, when a petition was filed to enforce a lien for a debt contracted shortly before her departure. The vessel had in the mean time been in different ports of the United States, and her arrival there was announced in the usual manner, but there was no evidence that the petitioner had actual notice thereof. *Held*, under the St. of 1855, c. 231, § 1, declaring that the lien "shall continue until the debt is satisfied," that the petition was seasonably filed, although her ownership had been changed.

On a petition to enforce a lien on a vessel under the St. of 1855, c. 231, if interest is not due as part of the debt, but as damages only, it is to be computed from the filing of the petition, and not from the time of a prior demand; and the fact that before bringing the petition, proceedings were had in a court of the United States which were dismissed for want of jurisdiction, makes no difference.

PETITIONS to enforce liens under the St. of 1855, c. 231, on the ship Orpheus, for materials furnished for and used in her construction in 1855 and 1856. The cases were tried together in the Superior Court, before *Brigham*, C. J., without a jury. The facts found by him, so far as it is material to state them, were as follows :

In August, 1855, Mitchell & Rice, ship-builders, having their place of business in Chelsea, made an express contract with William F. Weld & Co. of Boston, to build for them a ship of about twelve hundred tons for a specified price. The petitioners in each case, under an oral contract with Mitchell & Rice, delivered to them, at various dates from September, 1855, to February, 1856, at a price agreed, several cargoes of lumber, all of which was furnished for and in relation to the construction of said ship, and was actually used in such construction, except a few thousand feet, in each of the first two cases, of which a small part, but how much did not appear, was used in launching the ship at Chelsea, and the rest amounting in value to $411.68, in the first case, and $22.50 in the second, was subsequently sold by the assignees in insolvency of the estate of Mitchell & Rice, and its proceeds appropriated to the use of that estate.

By the contract with the petitioners in the first case, Mitchell & Rice were to have a credit of sixty to ninety days on the price of the lumber, and the lumber was not furnished by the petitioners upon the credit of the ship exclusively, but principally upon the credit of Mitchell & Rice, in view, however, of an ulterior liability of the ship and its owners for the lumber, upon the failure of Mitchell & Rice to pay for the same, which they had

promised to do. In the second case, the lumber was furnished by the petitioner upon the credit of the ship. In the third case, the lumber was ordered by Mitchell & Rice, stating that they wanted it for the ship, and it was furnished primarily upon their credit.

At the time when the contract with each of the petitioners was made and the lumber furnished under it, the ship was in the course of construction at Chelsea. She was launched unfinished at Chelsea on February 29, 1856, and on the same day was taken to Lewis's Wharf, in Boston, where her construction was continued and completed, in hull, spars, rigging and sails, and a small portion of the lumber furnished as aforesaid by the petitioners was there used for making chocks for boats and other similar purposes.

On March 22, 1856, the ship, with a cargo on board, sailed from Boston for San Francisco, and did not return to Boston or to any port in Massachusetts until July, 1871, when she was detained by process in these cases. In the intervening time she was frequently in other ports of the United States, and her arrival there was announced in the usual mode in the newspapers, but there was no evidence that the petitioners had actual notice thereof.

On March 15, 1856, the ship was seized by the marshal upon process issued by the District Court of the United States for the District of Massachusetts, upon libels of these petitioners to enforce the same liens and debts. Upon stipulations of the respondents, the ship was delivered to them, and the libels were dismissed by the District Court, and by the Circuit Court of the United States upon appeal, because the courts of the United States had no jurisdiction in admiralty to enforce liens against the ship for labor and materials furnished before she was launched. *The Orpheus,* 3 Ware, 143 ; *S. C.* 2 Cliff. 29.

The petitioners in the first and second cases filed in the office of the town clerk of Chelsea, on February 28, and March 19, 1856, and in the office of the city clerk of Boston, on March 25, 1856, and the petitioner in the third case filed in the office of the town clerk of Chelsea, on March 19, 1856, and in the office of the city clerk of Boston, on March 25, 1856, a certificate containing a statement, subscribed and sworn to by the petitioner, giving

a just and true account of the demand claimed to be due to him for furnishing said lumber for and in relation to the construction of the ship, with all just credits; except in the first case, as the account might be affected by the credit of sixty to ninety days as before mentioned; and in the second case that the footing of the account was erroneously stated at $462.83, when it should have been stated at $362.83, as appeared upon the face of the account by examining the items added up. Each certificate also stated the names of the persons with whom the contract under which the lumber was furnished was made, the names of the owners of the ship, and the name and description of the ship sufficient for identification; but in the first and second cases did not contain a statement containing a just and true account with all just credits of the quantity and value of the lumber furnished as aforesaid, which was actually used in the construction of the ship, but included all the lumber delivered as aforesaid under the contract.

The petitioners have not been paid any part of the amounts claimed in their respective petitions.

William F. Weld & Co., before these petitions were filed, either by payments in cash or by the discharge of liens claimed upon said ship, have paid to Mitchell & Rice the full price agreed for the construction of said ship, but none of such payments or discharges of liens have been for the benefit of the petitioners, or have operated to discharge the liens or pay any part of the sums of money claimed in these petitions.

.Some years before the return of the ship to Boston, the firm of William. F. Weld & Co. was dissolved, William. F. Weld and William. G. Weld retiring therefrom, and Richard Baker, Jr., previously a partner of said firm, forming a new firm, under the style of William. F. Weld & Co., consisting of Richard Baker, Jr., and George W. Weld, of Boston, and Frederick Baker, of New York, of which dissolution and formation public notice was given in the newspapers, and thereupon the ship became the property of the new firm, which defends these suits.

Chelsea, in 1855 and 1856, had piers or wharves for the loading and unloading of vessels, houses and stores, and a municipal organization wholly independent of Boston, and by the U. S. St. of 1850, c. 79, an inspector of customs, and was within the revenue district for the purposes of customs of the port of Boston.

Upon the foregoing facts and their effect, the judge ruled " that the ship, within the meaning and scope of the St. of 1855, *c.* 231, was partly constructed in the port of Chelsea, and partly constructed in the port of Boston ; that within the meaning and scope of that statute, the port of Chelsea was no part of the port of Boston, but another and different port therefrom, and that the removal of the ship from Chelsea to Boston, on the day of her launching, on February 29, 1856, was a departure of the ship from the port of Chelsea; that the certificates filed in the office of the clerk of the town of Chelsea on February 28, and March 19, 1856, were not so filed within four days 'from,' that is to say ' after,' the departure of the ship from the port of Chelsea, where she was when Mitchell & Rice contracted with the several petitioners the debts for which liens are sought to be enforced in these cases; and that the filing of the certificates on March 25, 1856, in the office of the clerk of the city of Boston, were within four days ' from,' that is to say ' after,' the departure of the ship from the port of Boston, on March 22, 1856, but were of no legal effect, she not having been in the port of Boston when the debts to which said certificates relate were contracted."

The judge also ruled, " that, irrespectively of the failure to file said certificates seasonably, and if the petitioners' exceptions to the rulings of the court thereon are sustained, the petitioners, upon the legal effect of the facts found by the court, cannot maintain their several petitions, especially for interest upon their claims from, or in any relation to, the time of their libels in the United States District Court."

Upon the foregoing rulings the judge found for the respondents ; and the petitioners excepted to his rulings and findings.

*E. F. Hodges & J. F. Barrett,* for the petitioners.

*E. H. Derby,* for the respondents.

GRAY, C. J. The St. of 1855, *c.* 231, § 1, under which the rights asserted in these cases arose, gave a lien upon a vessel whenever by virtue of any contract, express or implied, with her owners, or with any agent or contractor of such owners, or with any person employed to construct, repair or launch her, money was due to any person " for labor performed, materials used, or labor and materials furnished, in the construction, launching or repairs of, or for constructing the launching ways for, or for pro-

visions, stores or other articles furnished for or on account of ' the vessel.

1. The words "or labor and materials furnished" were inserted to make it clear that the statute covered the case of a person who did not himself perform the labor or own the materials, but obtained labor or materials from third persons to carry out his contract with the owners or their representative. But the "labor and materials furnished," as well as the "labor performed" and "material used," must be "in the construction, launching or repairs of, or for constructing the launching ways for" the ship. The statute does not allow labor and materials, as it does stores and provisions, to be merely furnished "on account of" the ship ; and the difference in the language of the two clauses is significant. The statute doubtless includes materials fitted and adapted to be parts of the ship, and accepted as such by the other party to the contract, even if they have not been put in place upon the ship. But it gives no lien for materials which have neither been built upon or attached to her, nor been prepared and fitted for that purpose, and which have not been actually or constructively made part of her. *The Antarctic*, 1 Sprague, 206. *The Peruvian*, 3 Ware, 154. *Rogers* v. *Currier*, 13 Gray, 129, 132. *Barstow* v. *Robinson*, 2 Allen, 605. *Jones* v. *Keen*, 115 Mass. 170, 184, 185.

It follows that the petitioners were entitled to liens for so much only of the lumber and plank furnished by them, as was actually used in the construction of the vessel. Although a small portion of the rest was used in launching her, it does not appear how much in amount or value was so used, and no lien can therefore be sustained because of such use.

2. Neither the allowance of credit in one of the cases, nor the fact that in that case, and in one of the others, the materials were delivered primarily on the credit of the builders, defeated the lien — no note or security having been taken, and it being clear that in neither case was it the intention to give exclusive credit to the builders personally. *The Nestor*, 1 Sumner, 73. *The Chusan*, 2 Story, 455. *The Guy*, 9 Wall. 758. *The Patapsco*, 13 Wall. 329. *Jones* v. *Keen*, 115 Mass. 182.

3. The St. of 1855, c. 231, § 2, does not (like the St. 1851, c 343, § 2, under which the case of *Lynch* v. *Cronan*, 6 Gray, 531,

was decided) require the certificate filed by the petitioner to contain "a just and true account of the demand justly due him," but "of the demand claimed to be due him;" and more nearly corresponds to the provisions of later statutes, by which inaccuracies in the certificate do not invalidate the proceedings unless it appears that the petitioner has wilfully and knowingly claimed more than is due to him. St. 1855, *c.* 231, § 3. Gen. Sts. *c.* 150, § 6; *c.* 151, §§ 13, 14. *Hubbard* v. *Brown*, 8 Allen, 590. *Story* v. *Buffum*, 8 Allen, 35, 37. *Jones* v. *Keen*, 115 Mass. 181.

It follows that these proceedings were not invalidated by the including in the certificates, in two of the cases, of a claim for the portion of lumber not actually used in the construction of the ship, and which we have therefore held not to be covered by the lien, but which was supplied under each petitioner's contract in relation to this ship, and to which he might well believe that his lien extended; nor by the merely clerical error in the certificates, in the other case, in adding up the items of the account, which themselves clearly show the amount of the demand claimed and actually due.

4. The same section provides that the certificate shall be filed "within four days from the time such ship or vessel shall depart from the port at which she was when the debt was contracted in the office of the clerk of the city or town within which such ship or vessel was at the time the debt was contracted."

For purposes of the customs, pilotage and navigation, the port of Boston is not limited to the municipal limits of the city of Boston, but includes the opposite shore of Chelsea. U. S. St. 1850, *c.* 79, § 13. Gen. Sts. *c.* 52, § 28. *Martin* v. *Hilton*, 9 Met. 371. The taking of the vessel in an unfinished state from one part of the port to another was not a departure from port in any sense, and the ship did not "depart from the port at which she was when the debt was contracted," until she sailed upon her voyage.

5. The provision that the certificate shall be filed "within four days from the time" of her departure, allows it to be filed at any time before the expiration of the four days. Whether it was filed before or after the beginning of the four days is immaterial.

The certificates filed by the petitioners were therefore all that the statute required.

6. The statute provides that the lien shall continue until the debt is satisfied. St. 1855, *c.* 231, § 1. Gen. Sts. *c.* 151, § 12. These petitions, having been filed upon the first return of the ship within the jurisdiction of the Commonwealth, were seasonably instituted. *Foster* v. *The Richard Busteed*, 100 Mass. 409.

7. The extent of the lien depends upon the terms of the statute which creates it. In each of these cases, interest was not due as part of the debt under the original contract between the petitioners and the builders, and can only be claimed as damages for the neglect to pay. Such damages are not mentioned in the statute, and form no part of the claim secured by the lien against the ship and her owners. Interest is therefore to be computed only from the filing of these petitions, being the first lawful demands for the enforcement of the liens against the vessel. *Barstow* v. *Robinson*, 2 Allen, 605. It was held in that case that interest could not be computed, in a petition against the vessel to enforce the lien, from the time of a previous demand, although, as appears by referring to the original bill of exceptions, such demand had been made upon those who then were, and at the time of filing the petition continued to be, the owners of the ship, and although the contractors to whom the goods were furnished had expressly promised to pay interest. The unsuccessful attempt to invoke the jurisdiction of the federal courts can have no greater effect in this respect than a demand in the country upon the parties interested.

In the matter of interest, the practice of courts of admiralty, in the exercise of the discretion incident to their general jurisdiction, can afford no guide to a court of common law, administering a new remedy conferred and limited by express statute. But it may be doubted whether even a court of admiralty would allow interest before the commencement of the suit in such a case as those now before us. See *The Isaac Newton*, Abbott Adm, 588, *Exceptions sustained.*