## Case No. 7,341.

### The JOHN FARRON.

[14 Blatchf. 24.] [1]

Circuit Court. S. D. New York. Nov. 11, 1876. [2]

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Reversing Case No. 7,340.]

Dennis McMahon, for libellant.
Robert D. Benedict, for claimant.

JOHNSON, Circuit Judge. Since the decision of this case in the district court [Case No. 7,340], the supreme court of the United States, in the case of The Lottawanna, 21 Wall. [88 U. S.] 558, has declared the law in regard to some questions about which conflicting views were entertained by different judges. It must now be deemed settled, that material men furnishing repairs and supplies to a vessel, in her home port, do not thereby acquire any lien upon the vessel, by the general maritime law, as received in the United States, but that, so long as congress does not interpose to regulate the subject, the rights of material men furnishing necessaries to a vessel in her home port may be regulated, in each state, by state legislation; that such con-

tracts are maritime, and fall within the domain of the admiralty jurisdiction; and that, when, in such cases, a lien is given by the state laws, such lien may be enforced by the district courts of the United States, under the 12th rule, as modified by the supreme court of the United States, May 6th, 1872. This view is maintained to be the law by the supreme court, while admitting that the practice may be somewhat anomalous, upon the ground that it has existed from the origin of the government, and that, whatever may have been its origin, and whether it was or was not based upon the soundest principles, it has become firmly settled, and it is now too late to question its validity. These must be accepted as the controlling views of the supreme court upon this subject, and must be followed by this court. In the cases of The Edith [Case No. 4,283] and The Circassian [Id. 2,726], decided in this court, in February, 1874, the views expressed by my learned predecessor must yield to the later judgment of the supreme court, in the case of The Lottawanna [supra], in so far as they are not in harmony.

The principal point of difference material in this case is in respect to the power and rightfulness of maintaining the lien created by state legislation, while disregarding as unconstitutional the provisions of state statutes which attempt to confer upon state courts the power to proceed in rem, in enforcement of such liens. It is this anomaly which the supreme court accepts as the law, and which, therefore, it is the duty of this court to act upon. In the courts of New York (In re The Josephine, 39 N. Y. 19, and Brookman v. Hamill, 43 N. Y. 554), the state lien law was held to be unconstitutional, because it attempted to give process in rem, and thus was held to invade the grant of admiralty jurisdiction to the United States. The adjudication did not go beyond the validity of the proceeding in rem, and, therefore, the provision for the lien in the specified cases remains to be enforced, when the contract is maritime, in the courts of admiralty. The decisions in The Edith and The Circassian [supra] were made in view of the law as it was at the time understood, and also in view of the possibility that the supreme court might determine the law to be that material men had a maritime lien even in the case of a domestic vessel, and in the absence of any state law conferring a lien. I am, therefore, of opinion that the state law conferring a lien may, in case of a maritime contract, be availed of in the courts of admiralty.

The state law of April 24th, 1862 (Laws 1862, p. 956, § 1), gives a lien "whenever a debt * * * shall be contracted by the master, owner, charterer, builder, or consignee, of any ship or vessel or the agent of either of them, within this state, for either of the following purposes: 1st. On account of work done, or materials or other articles furnished, in this state, for or towards the building, repairing, fitting, furnishing or equipping such ship or vessel." The claim of the libellants coming plainly within the designated purposes, the question is, whether the debt was contracted by a person sustaining such a relation to the vessel as is included in the terms employed by the statute. The debt was contracted upon the credit of the vessel, by Stevens, or Stevens and Gardner, who were in possession, and had the control of the vessel, by the consent of Hamill, the claimant, and he had been, and claims still to be, the owner. This possession was delivered about the 27th of May, 1872, and from that time on, until about the 1st of August, when the claimant took her from the marshal, on bonding her in this proceeding, he had no actual possession, and neither exercised nor attempted to exercise any control over her. On the 20th of May, 1872, Hamill, as owner, entered into a written contract, by which he agreed to sell the vessel to Stevens and Gardner, and they agreed to buy her, for $10,000, payable in notes of $1,250 each, with interest, at 3, 6, 9, 12, 15, 18, 21, and 24 months, made by Gardner, and indorsed by Stevens, with a mortgage on the boat as security, and policies of insurance to cover the same, payable, in case of loss, to the claimant. Hamill further agreed, by the same instrument, that, on the 25th of May, he would deliver a bill of sale to Gardner and Stevens, upon their delivering to him the notes, mortgage and policies, as above provided. It went on: "and I do agree to allow said Gardner and Stevens, upon delivery of said papers, to have possession of said steamboat called John Farron, and do all repairs and alterations which they wish to said boat; but the said repairs or alterations, of whatsoever kind or nature, shall not be a lien or claim upon said steamboat, or her owner, the said Henry F. Hamill, but shall be paid by said Gardner and Stevens." On the 25th, which was Saturday, nothing appears to have been done, but, on the 27th, the parties met at the custom house, to carry out the bargain. It then appeared to be necessary to remeasure the boat, and that this could not be done till the proposed repairs were completed. The boat had been the property of the United States, and had been sold at auction, and purchased by Hamill, but he had not had her enrolled, and there were, therefore, no papers by which a formal bill of sale could be completed. Stevens and Gardner gave the requisite notes to Hamill, which, however, were wrong in form, and were, in a few days, replaced by others in correct form, which Hamill received and retained. No mortgage was given, for the same reason that the bill of sale was not executed. Hamill signed and acknowledged a printed bill of sale, under his seal, and dated May 27th, 1872, filling up none of the other blanks, except

that his name, as sole owner of the steamboat or vessel called the "Ella M. Stevens," was inserted. This paper was left at the custom house, with the custom house brokers who were attending to the business. They were told by Hamill not to part with it without his orders, and it was subsequently given up by them to him. As they left the custom house, Stevens asked Hamill when they could have possession, and was told that Hamill would instruct his watchman to give them possession. About June 1st possession was, accordingly, given. The boat was at Weehawken, and was brought, under the orders of Stevens, to the foot of Le Roy street, where Stevens went aboard, and took charge of her, and from that time he had the possession and control of the vessel. He hired persons as engineer and fireman, and put them on board, and employed and made contracts with mechanics to repair her. Hamill did not exercise any authority or control over the vessel from the time when possession was given by his orders to Stevens, until after this suit was instituted. Before possession was given to Stevens, he had said, in Hamill's presence and hearing, when they were at the custom house, that they (Stevens and Gardner) were going to run the boat on the North river, and that he (Stevens) was going as master, and Gardner was to go as clerk.

It was not the intention of the parties that the title of the vessel should pass from Hamill to Stevens and Gardner, by the delivery of her into their possession; but it was their purpose to put her under their entire control, leaving the unfulfilled portion of the contract to be carried out in the future, by the completion of the bill of sale and the execution of the mortgage. Stevens and Gardner being thus in possession, by the consent of the owner, were enabled to appear as owners to third persons, and thus to obtain credit for the vessel as her owners, or through Stevens as her master. Having obtained fresh credit from the libellant, I think the vessel was liable to answer for the debt, under the statute of New York before cited. Hawes v. The James Smith [Case No. 6,238]; The May Queen [Id. 9,360]; Weaver v. The S. G. Owens [Id. 17,310]; Jackson v. The Julia Smith [Id. 7,136]. I do not understand the position I have stated to be in conflict with what was said by the court in The Druid, 1 W. Rob. Adm. 391, 398, nor with the explanatory observations of the same learned judge in The Bold Buccleugh, 3 W. Rob. Adm. 220, 231. In the first of these cases, the question was as to the liability of the vessel for the wilful misconduct of the master in colliding with another vessel. It was said that the vessel was not liable unless the owner was, and it was held that the owner was not liable for the wilful trespass of the master. But the court had no occasion to consider the effect of apparent ownership by consent of the actual owner. In the latter case the question was, whether a change of ownership did, under the circumstances, defeat a lien for damages for a collision occurring in the time of the former owner; and it was held that the claim could still be enforced against the vessel.

The agreement between Hamill and Stevens and Gardner, that they should subject the vessel to no lien by repairs, cannot prevent a lien occurring as to persons having no knowledge or notice of that agreement; and this appears to have been the fact in respect to the libellant.

The taking of the vessel to the dock in New Jersey for a single day, in the process of repairing her, was not a departure, within in the meaning of the statute, and, therefore, no specification of the claim was necessary to be filed under the statute. There must be a decree for the libellant in the usual form, which may be settled on notice.