## ALLAN L. McDONALD *vs.* THE NIMBUS.

Suffolk.    March 4. — June 28, 1884.    DEVENS & COLBURN, JJ., absent.

If the hull and spars of a vessel are completed at one port, and sufficient rigging
is put on her, and a sufficient cargo for the necessary ballast is taken, to enable
her to go to another port, where materials necessary to the rigging and equip-
ment of a vessel, and the first put upon her, are procured, the materials so
furnished at the latter port are furnished in the "construction" of the vessel,
within the Gen. Sts. *c.* 151, § 12.

No lien can be enforced, under the Gen. Sts. *c.* 151, §§ 12–15, for materials fur-
nished in this Commonwealth, in the construction of a vessel at a port in
another State.

A lien upon a vessel, under the Gen. Sts. *c.* 151, § 12, for materials furnished in
her construction, is not invalidated by including articles for which no lien at-
taches, or by an error in the addition of the amounts of the items, in the state-
ment filed in the clerk's office of the city where the materials are furnished, if
the claimant has not " wilfully and knowingly claimed more than is due."

A statement of a claim of a lien for materials furnished in the construction of a
vessel was filed, under the Gen. Sts. *c.* 151, §§ 12, 13, within four days after the
first departure of the vessel from the port where the materials were furnished.
During the next two and a half years, the vessel came into that port on several
occasions, to the knowledge of the person claiming the lien; but he did not
file his petition to enforce the lien until four and a half years after such first
departure, and after the vessel had been sold.    *Held,* that the petition was sea-
sonably filed.

PETITION, inserted in a writ dated October 31, 1881, to enforce
a lien on a vessel.    The case was submitted to the Superior
Court, and, after judgment for the petitioner, to this court on
appeal, upon agreed facts, in substance as follows:

The schooner Nimbus was built at Bath, Maine, in the years
1876 and 1877, by Deering and Donnell of that place, under a
contract with Leonard Walen, of Gloucester, in this Common-
wealth, and from plans and specifications furnished by him.
This contract covered only the hull and spars of the vessel, and
did not include the rigging.    The hull was completed, the masts
were put in, the vessel launched, and the spars furnished by the
contractors at Bath.    She was launched on or about January
12, 1877.    Walen took possession of the vessel shortly after her
launching, put upon her only what rigging was needed for the
trip, and brought her in this condition to Gloucester, where he
completed her rigging and fitted her for sea.    Some of the vessel's
spars, including her topmasts, were never put in place until after
she got to Gloucester.    It was necessary to have ballast in the

vessel on this trip, and Walen took a load of ice in her for this purpose, which he bought in Bath and sold in Gloucester after the vessel's arrival there. The crew that brought the vessel from Bath to Gloucester were employed by Walen. The vessel arrived in Gloucester some time between January 27 and 31, 1877, and remained there until April 11, 1877, when she left Gloucester on her first voyage after being completed, as above stated, and for the first time after her arrival there. On January 27, 1877, the vessel was registered at the custom-house in Bath, in the name of J. F. Donnell, one of the contractors, as sole owner. This was the first registry she ever had. On January 31, 1877, a bill of sale of that date from J. F. Donnell to Leonard Walen was recorded at the custom-house in Gloucester, of the whole of the vessel, and she continued thereafter to be registered at Gloucester in Walen's name as sole owner.

On or about January 11, 1877, while the schooner was still at Bath, Walen bought of the petitioner, who was a dealer in such articles at Gloucester, a set of blocks and mast-hoops for her. Walen told the petitioner what vessel the blocks were intended for, and gave him the number of her sails and the size of blocks desired, to enable him to select the proper blocks to compose a set for such a vessel. Walen also told the petitioner that he was the owner of the schooner. The sum of $168 was agreed on between Walen and the petitioner as the price for the entire set of blocks and hoops. Walen directed the petitioner to deliver the entire set of blocks and hoops to Thomas Sims, of Gloucester, a rigger, and said that Sims was to rig the vessel. The entire set was accordingly delivered by the petitioner to Sims, at Gloucester, on January 12, 1877. Sims was employed by Walen to rig the vessel. He went to Bath with James Nickerson, the first master of the vessel, put on her there what rigging was needed to bring her to Gloucester, and took with him for this purpose all the hoops and more than half the blocks bought of the petitioner, in value about $100. These he put upon the schooner at Bath, after Walen had taken possession. The remainder of the set he put upon her at Gloucester. They were all used in rigging the vessel, and were all in use on board her when she left Gloucester on her first voyage above referred to.

While the vessel was in Gloucester, before sailing on her first voyage from that port, Walen bought of the petitioner other articles for her, on March 8 and April 4, 1877, amounting in all to $18.57. These articles were ordered either by Walen or by Nickerson, employed by Walen as master of the vessel, under Walen's direction to the petitioner to let Nickerson have such articles for the schooner, as they were needed. They were all delivered to Nickerson, all used in rigging the schooner and fitting her for sea, and all in use on board when she sailed. The petitioner was informed at the time of purchase, by Walen or Nickerson, that they were intended for the schooner, and they were all charged to the schooner on his books, as were the blocks and hoops. The above articles, as well as the blocks and hoops, were necessary to the rigging and equipment of a schooner, and were the first that were put upon this schooner.

Walen never paid the petitioner for the blocks or any of the articles sold as above, nor has the petitioner ever received from any one anything whatever on account of them. No dispute is made as to the items of his bill, or that the prices charged are not reasonable and usual. On April 14, 1877, within four days after the vessel's first departure from Gloucester, the petitioner filed in the office of the city clerk of Gloucester a statement of his demand and claim of lien. The amount of the column of items is therein given as $186.67, instead of $186.57, the true amount thereof. This was an error inadvertently made by the petitioner in drawing up his statement, not discovered or noticed until long afterward. It was not a wilful or intentional over-statement of the amount due him. The price of the set of blocks, as given in the record made by the clerk on his books, is $68, instead of $168, the true amount. The petitioner had no knowledge or notice, until after the commencement of this suit, that it did not correspond in all respects to the statement filed by him.

Walen continued to be sole owner of the schooner from the time she was built, as above, until November, 1879, when she was wrecked at or near Shelburn, Nova Scotia, sold by auction as a wreck, and bought by the present respondents, residents of Placentia, Newfoundland. They never had any actual notice of the existence of the petitioner's claim, and no constructive

notice thereof, other than the record above referred to, until the commencement of this suit. Between April, 1877, and November, 1879, the schooner made several trips from Gloucester, and was in that port on several different occasions. The petitioner has resided at Gloucester ever since the articles described in his bill were furnished, and knew of the vessel's being in Gloucester on some of these occasions.

If, on the above facts, the petitioner had a valid lien, at the date of the writ, which could be enforced by this court, against said vessel, for the amount of his bill, or any part thereof, judgment was to be entered in his .favor accordingly, with interest from the date of the writ; otherwise, the petition to be dismissed.

*F. Dodge,* for the petitioner.

*F. Cunningham,* (*E. N. Hill* with him,) for the respondents.

FIELD, J. We do not find it necessary to determine whether, under the existing decisions of the Supreme Court of the United States, and the existing admiralty rules, this court has jurisdiction to enforce a lien created by the statutes of the Commonwealth for materials used or labor performed in repairing a domestic vessel. See *Donnell* v. *The Starlight,* 103 Mass. 227; *Foster* v. *The Richard Busteed,* 100 Mass. 409; *The Lottawanna,* 21 Wall. 558, 580; *The Guiding Star,* 9 Fed. Rep. 521, and 18 Fed. Rep. 263; *Stewart* v. *Potomac Ferry Co.* 5 Hughes, 372; *The Woolsey,* 3 Fed. Rep. 457, and 4 Fed. Rep. 552; *Hayford* v. *Cunningham,* 72 Maine, 128; *Weston* v. *Morse,* 40 Wis. 455; *Crawford* v. *The Caroline Reed,* 42 Cal. 469.

It is conceded that a contract to construct a vessel is not a maritime contract; that a lien created by the statutes of a State for labor and materials furnished in the construction of a vessel is not a maritime lien; and that therefore the District Court of the United States, as a court of admiralty, has no jurisdiction to enforce such a lien. The jurisdiction is in the State courts. *Foster* v. *The Richard Busteed, ubi supra. Wilson* v. *Lawrence,* 82 N. Y. 409. *Roach* v. *Chapman,* 22 How. 129. *Edwards* v. *Elliott,* 21 Wall. 532. *The Orpheus,* 2 Cliff. 29. The facts, we think, show that the materials furnished in this case were furnished in the construction of the vessel. She was not so far constructed as to be fitted for sea, and used as a commercial

vessel, until after her arrival in Gloucester. *Wilson* v. *Lawrence,*
*ubi supra.* We do not find it necessary to determine whether,
within the meaning of the Gen. Sts. *c.* 151, § 12, Walen was the
owner of the vessel before January 31, 1877, when the bill of
sale was made to him.

The statutes contemplate that the vessel must be in the Com-
monwealth when the debt is contracted, if a lien is to be estab-
lished under the statutes. The Gen. Sts. *c.* 151, § 12, give a lien
for labor, materials, and supplies " furnished for or on account of
such ship or vessel in this State." This may be said to be am-
biguous, and to leave it uncertain whether the ship or vessel must
be in this State when the materials and supplies are furnished,
or whether the materials or supplies must be furnished to the
owner or other person in this State, without regard to the place
in which he is constructing the vessel. But § 13 provides that
" such lien shall be dissolved unless the person claiming the same
files, within four days from the time the ship or vessel departs
from the port at which she was when the debt was contracted, in
the office of the clerk of the city or town within which the ship
or vessel was at the time the debt was contracted, a statement,"
&c. Section 14 makes provision for a ship or vessel partly
constructed in one place and partly in another, and provides that
" either place shall be deemed the port at which she was when
the debt was contracted, within the meaning of this chapter."
Section 15 provides that " such lien may be enforced by petition
to the Superior Court for the county where the vessel was at the
time the debt was contracted or in which she is at the time of
instituting proceedings." It is manifest from reading these sec-
tions, that the clerk of the city or town in whose office the state-
ment must be filed is the clerk of some city or town in this
Commonwealth; and that the ship or vessel must have been
within this city or town when the debt was contracted, unless
the vessel was partly constructed in one place and partly in
another place in the Commonwealth, and then only one state-
ment is necessary, and that may be filed with the clerk of
either place. It would be an extraordinary statute that should
attempt to establish a lien upon property situated without the
limits of the Commonwealth, and the Legislature clearly has
made no such attempt.

The materials bought by Walen or his agent after the vessel came to Gloucester, which were used in the construction, amount in value to $18.57. These amounts were duly set out in the statement filed with the city clerk of Gloucester, within four days after the vessel's first departure from Gloucester. The error in the record does not affect these items. It does not appear that the petitioner, in including the set of blocks and hoops sold while the vessel was in Maine, or in the mistake of ten cents made in the addition of the amount of the items, "wilfully and knowingly claimed more than is due;" Gen. Sts. *c.* 151, § 14; and the lien is not thereby invalidated. *Young* v. *The Orpheus*, 119 Mass. 179.

The only remaining question which has been argued is that of laches. The Gen. Sts. *c.* 151, § 12, provide that the lien "shall continue until the debt is satisfied." It is a lien of record. In this case, as the vessel was principally constructed in Bath, Maine, a purchaser would naturally look there for the record of any statutory liens. Still, as we have held that she was not completely constructed there, but was partly constructed in Gloucester, the fact that the materials furnished for her construction in Gloucester were very small in amount cannot affect the principle. They "were necessary to the rigging and equipment of a schooner, and were the first that were put upon the schooner." Maritime liens, at least such as are created by the general maritime law, are liens of which there is no record, and must be seasonably enforced, especially when the vessel has passed into the possession of a purchaser for value without notice of the lien. But the legal record of a statutory lien is notice to all subsequent purchasers of the vessel.

We think the petition was seasonably filed. The petitioner is entitled to judgment for $18.57, and interest thereon from the date of filing the petition. *Young* v. *The Orpheus, ubi supra.* *Ordered accordingly.*