THE JAMES H. PRENTICE.

MYLES *et al.* v. THE JAMES H. PRENTICE.

*(District Court, E. D. Michigan.* November 21, 1888.)

1. MARITIME LIENS—MATERIALS FURNISHED—PRINCIPAL AND AGENT.
   S., sole owner of a barge, contracted with B. to repair and improve her. While the work was going on he agreed to sell a half interest in her to K., and further authorized K. to superintend the work, and to settle the bills therefor. He subsequently conveyed to him his half interest. Libelants, knowing nothing of the contracts with B. and K., and supposing K. to be a part owner, furnished lumber to the contractor B., which K. inspected and promised to pay for. *Held,* that S. had so conducted himself as to lead libelants to believe that K. was authorized to bind the vessel, and that they had a lien for the amount of their bill.

2. SAME—USE OF MATERIALS.
   Under a statute giving a lien for materials "furnished" in and about the building and repairing of water craft it is sufficient to show that the materials were ordered for and delivered to or near the vessel, though it appeared that a part of them were subsequently diverted, and used for other vessels. The act does not require proof that the materials were actually incorporated into the vessel sought to be charged.

In Admiralty. Libel for material furnished.

On libel for lumber furnished the steam-barge James H. Prentice, a domestic vessel, while being repaired at Detroit, in March and April, 1886. The following defense was interposed by Lewis D. Sanborn and John Kelly, claimants, viz.: That in January, 1886, Sanborn, who was then sole owner, made a contract with one Beaudry to build a cabin upon and double deck the Prentice, furnishing all work and material necessary for that purpose, for $3,850; that about January 10th Beaudry began work under his contract, and continued the same until April 28th, when he abandoned the job, leaving it incompleted, whereby Sanborn suffered

damages in completing the work in the sum of $400; that when Beaudry abandoned his contract there was nothing whatever due him thereunder, nor was there anything due to him at the time the lumber sued for was furnished; that no notice was given to the respondents, or either of them, nor to the master, of the libelant's claim or any part thereof, until after the abandonment by Beaudry of his contract. The answer also denied, upon information and belief, that any of the lumber furnished was used in or upon the steam-barge, and avers that whatever was furnished was supplied upon the personal credit of Beaudry, and that the same did not constitute a lien upon the barge.

- *George W. Radford*, for libelants.

*H. H. Swan*, for claimants.

BROWN, J. By How. St. § 8236, "every water craft of above five tons burden, used or intended to be used in navigating the waters of this state, shall be subject to a lien thereon: (1) For all debts contracted by the owner or part owner, master, clerk, agent, or steward of such craft * * * on account of work done, or materials furnished, by mechanics, tradesmen, or others in and about the building, repairing, fitting, furnishing, or equipping such craft: provided that, when labor shall be performed, or materials furnished as aforesaid, by a subcontractor or workman other than an original contractor, and the same is not paid for, said person or persons may give the owner or his agent, or the master or clerk of said craft, timely notice of his or their said claim, and from thenceforth said person or persons shall have a lien upon said craft, *pro rata*, for his or their said claim, to the amount that may be due by said owner to said original contractor for work or labor then done on said water craft."

As there is no allegation in the libel that this steam-barge was used or intended to be used in navigating the waters of this state, it is undoubtedly defective in this particular. I have had frequent occasion to hold that this allegation was jurisdictional, and must appear wherever it was sought to enforce a lien given by the state statute; but as the fact appears to be that the Prentice was a domestic vessel of more than five tons burden, and was actually used in navigating the waters of this state, I will permit the libel to be amended, and will dispose of the case upon its merits.

As the lumber was furnished to Beaudry, the contractor, who had undertaken to improve and repair the barge, it is incumbent upon the libelants, in order to charge the vessel or her owner, to show that the lumber was furnished upon the order of the owner or his agent. The facts in this connection are as follows: Some time in January, 1886, Sanborn, who was then the sole owner of the barge, contracted with Beaudry to put a double deck and cabin upon the Prentice for $3,850. While this work was pending, Sanborn agreed to sell a half interest in the vessel to John Kelly, his co-respondent in the case. It appears that Kelly was to become a half owner on the completion of the work by Beaudry, and that when she was completed he did become such, and now appears as one of the claimants in this case. Prior to March 11;

1886, libelants, who were lumber dealers in this city, delivered certain lumber to the Prentice upon the order for the same by Beaudry, who was then engaged upon his work. This lumber, however, they charged upon their books to the Prentice directly. They had no knowledge of the contract between Sanborn and Beaudry for the work, or between Sanborn and Kelly for an interest in the vessel. Some time in February Mr. Myles, one of the libelants, asked Beaudry for money on account of the lumber then furnished, and by appointment with Beaudry went to the dry-dock where the vessel was being overhauled, for the purpose of meeting Capt. Kelly; Beaudry having told Myles that he expected one of the owners down, and as soon as he came down he would get the money. Myles was there introduced to Kelly as one of the owners of the vessel. He then stated to him that he needed some money on the lumber account, to which Kelly replied that he expected some, and as soon as it came Myles should have it. A day or two afterwards Kelly came to the libelant's office with Beaudry, and asked him the amount of the bill, which was stated to him. He was also informed that the lumber had been charged to the Prentice; that it had always been libelant's custom to charge lumber furnished by them directly to the boats, to which Kelly stated: "That is all right. I am expecting a draft from Sanborn in a day or two, and, as soon as it comes, we will call in and settle your bill." Kelly also stated that Sanborn was the other owner. At this time Kelly was shown the residue of the lumber intended for the Prentice, which libelants had already gotten out, and had stored in their sheds. Kelly, in speaking of the lumber, announced his satisfaction with it, and, on Myles asking him about payment, stated that it would be all right, and that they would pay for the lumber before the boat was taken away; that they should let Beaudry have all the lumber necessary to complete the boat, and should have him certify to the bill and send it to Saginaw, and they would send a draft. After this conversation, which occurred about the 11th of March, Kelly called upon the libelants, and presented them a draft drawn and dated at East Saginaw, March 12th, payable to the order of Sanborn, for $476. This draft was indorsed by Sanborn, payable to Kelly. Kelly indorsed the draft, and gave it to Myles, who gave Kelly a check for $178.54, the difference between the amount of the draft and the bill of lumber furnished up to that time to the Prentice. From that time onward libelants furnished to the Prentice the lumber in question, and when the last of it was furnished obtained Beaudry's certificate to the correctness of the bill, in accordance with the instructions given by Kelly, and for the amount of this bill filed their libel. Prior to this, however, they wrote Kelly at East Saginaw, demanding a settlement, to which he replied under date of May 10th as follows:

"Mr. Beaudry settled up with me a week ago Wednesday, and said he would settle his bills. He had the contract to complete our boat for a certain sum of money, and we paid it to him, and durst not pay any of his bills without an order from him, as we had never appointed him our agent. If you had got an order from him before I settled with him, I might have been able to fix it

as I did with others. I understand Beaudry left for Canada, and paid no bills. He was doing work for other boats at the same time, and taking lumber from us to them. I claim we are not holden for Beaudry's drafts."

1. Assuming these to be the facts, (and the testimony largely preponderates in this direction,) the first question here is whether Kelly can be considered a part owner, or the agent of the owner, within the meaning of the statute, since it is clear that he bore no other relation to the vessel which would authorize him to bind her by the purchase of materials on her account. It is equally clear that Beaudry had no such power, since he was a mere contractor. *The Brunette*, 19 Mo. 518. The statute above cited also distinguishes the position of a contractor from that of an agent, and makes special provision for materials furnished to such contractor. Kelly, however, had contracted with Sanborn to purchase half the vessel as soon as her repairs were completed. This contract was subsequently carried out, and he appears in this case as one of the claimants, and part owner of the vessel. By his own statement he was to superintend Beaudry's work under his contract with Sanborn, and see that it was done in accordance therewith. As such superintendent he inspected the ceiling which Beaudry had selected of libelants, and assumed to make a modification of his contract. He appears to have been put forward by Sanborn as his only representative in Detroit, and to have attended to the payment of libelant's first account against Beaudry, and also to a certain account for timber furnished by parties in Royal Oak. If, under these circumstances, he told Myles that it would be all right to let Beaudry have all the lumber he wanted, and approved of such as Beaudry had selected, and represented himself as one of the owners of the vessel, it was very natural that the libelants should act upon his supposed authority to bind her. The tone of Kelly's letter, written from Sanborn's office on the 10th of May, in which he speaks of the Prentice as "our boat," and disclaims having appointed Beaudry "our agent," but does not disclaim his own authority, certainly indicates that he supposed he was acting for and in the interest of the vessel, of which he soon after became a part owner. While the case of *The John Farron*, 7 Ben. 53, resembles this in its leading features, it is distinguishable in the important particular that the proposed purchasers, who stand in the place of Kelly in this case, never completed their contract of purchase, and the vessel was returned to her original owner. But the authority of this case, even if it were directly in point, is very considerably impaired by the fact that it was reversed upon appeal, (14 Blatchf. 24,) Judge JOHNSON holding that the owner, having put the proposed purchasers in possession of the vessel, by which they were enabled to appear as owners to third persons, and thus to obtain credit for the vessel as her owners, the vessel was liable to answer for the debt. To the same effect is the case of *The James Smith*, cited in 2 Pars. Shipp. & Adm. 146. In this case possession of the vessel was delivered to certain persons who had contracted to purchase her, and, while in possession of the proposed vendees, repairs were put upon her, which were held to constitute a lien enforceable after the original owner had resumed possession, in conse-

quence of a breach of the condition of sale. See, also, *The May Queen*, 1 Spr. 588; *The Julia Smith*, Newb. Adm. 61.

In this case Kelly now represents a moiety of the vessel. Certainly, so far as this interest is concerned, he ought not to be permitted to repudiate his own orders, given while he was the equitable, though not the legal, owner, and represented himself as the actual owner to Myles. If libelants' testimony be true,—and I think the preponderance is largely in their favor,—he would be holden personally for this bill; and, as the credit was given to the vessel, I see no reason why they should not have a lien upon his interest. But I think the vessel is liable upon the further ground that Sanborn put Kelly in a position to lead the libelants, who knew nothing of his contract with Kelly or with Beaudry, to believe that he had authority to represent him in the purchase of the lumber for the repair of the vessel. He agreed to sell him half the vessel, sent him to Detroit as his sole representative to superintend the repairs, and paid his bills through him. Under these circumstances it was not strange that the libelants were misled as to his actual authority, and I do not think Sanborn has a right to complain.

2. Further objection is made to a recovery in this case upon the ground that there is no evidence showing how much of this lumber was actually used in repairing the vessel. The evidence upon this point is that all the lumber was sent to the vessel, and was placed either upon the vessel itself, or upon the dock at which she lay, for her use; but that subsequently Beaudry, without libelants' knowledge, drew a portion of this lumber away, and used it upon other vessels; and that, when she was taken away from this dock, a residue of the lumber which still remained on board was thrown upon the dock, and left there. In this connection a large number of cases are cited to the effect that under similar statutes it has been held necessary to show that the materials have been actually incorporated into the vessel sought to be charged. Upon careful examination, however, it will be found that few of these cases support so broad a contention. It is, indeed, held that the materials must have been actually "furnished," and that no lien arises from the breach of an executory contract, *e. g.*, a refusal to accept materials ordered. *The Pacific*, 1 Blatchf. 569, 588; *The Cabarga*, 3 Blatchf. 75; *The Daniel Kaine*, 31 Fed. Rep. 746, 748; *The Alida*, Abb. Adm, 173; *The Muskegon*, 7 Ohio St. 377; *Veltman* v. *Thompson*, 3 N. Y. 438; *Clark* v. *Smith*, 14 Ill. 361; *Stout* v. *Sawyer*, 37 Mich. 313; *Williams* v. *Chapman*, 17 Ill. 423. They must undoubtedly be appropriated to the use of a particular vessel; and, where materials were furnished for two vessels, which a contractor was building, without distinction between them, it was held the libelant could only recover against each vessel for the part which was used for her benefit. *The Kiersage*, 2 Curt. 421; *The Young Sam*, Brunner's Cases, 600; *Sewell* v. *Hull of a New Ship*, Ware, 565. In some cases, too, the statute required in terms that the materials should be "used in the construction or repair" of a vessel, which of course necessitated a more stringent proof of an actual use than simply when they are required to be "furnished." *The Antarctic*, 1 Spr. 206. In *Moores* v. *Lunt*, 1 Hun, 650,

the lien, under the New York statute, was held not to extend to cases where the vessel was in another state at the time the supplies were furnished.

In three or four cases the courts seem to have gone the full length of holding that, even if the materials be ordered for and delivered to the vessel, no lien will attach if they be subsequently diverted, and sent elsewhere by the vendee. The principal one of these is *Phillips* v. *Wright*, 5 Sandf. 342. This was an action upon a bond for the release of the vessel. The case was referred to Mr. Johnson, subsequently judge of the court of appeals and of the circuit court of the United States; indeed, it was he who delivered the opinion of the court in the case of *The John Farron*, above cited. He found that the timber, for the value of which the action was brought, was purchased by the owners of the vessel, and furnished by the plaintiff to them within the state as materials for or towards the building of the ship, and were delivered at the yard where the ship was building, but that some part of the timber was not in fact actually employed in the building of the ship, but was used for other purposes; that plaintiff did not in any manner assent to such use, nor was he aware thereof. He held as a matter of law that the plaintiff was entitled to recover his whole claim. Judge SANFORD, however, held that the whole theory of the lien rested upon the basis that the materials "entered into and contributed to the production or equipment of the thing upon which the lien is impressed. This imposes on the materialman the necessity of seeing to it that his materials are applied to the purposes for which they are procured, if he design to rely upon a lien given to him by reason of such purpose." This case is followed in *Hiscox* v. *Harbeck*, 2 Bosw. 506, in which a charge to the jury that proof that materials were ordered for a vessel then building, and were furnished upon and pursuant to such order, and were sent to the yard where the vessel was being built, was *prima facie* evidence of the use of them for the purpose for which they were ordered to entitle the plaintiff to recover, was held to be erroneous. "It is not enough," says the court, "in order to establish a lien upon a vessel, that an owner should order them, and that they be traced to the yard where the vessel is being built in common with other vessels." Substantially the same ruling was made by the supreme court of Maine, in *Taggard* v. *Buckmore*, 42 Me. 77, and, with reference to a mechanic's lien, in *Hunter* v. *Blanchard*, 18 Ill. 318, in *Chapin* v. *Paper-Works*, 30 Conn. 461, and in *Houghton* v. *Blake*, 5 Cal. 240.

Notwithstanding this formidable array of authorities, I find myself irresistibly impelled to a different conclusion. The statute authorizes a lien for "materials furnished in and about the building or repairing" of the craft. How those words can be tortured to mean that the materials so "furnished" must actually be incorporated into the craft, I am unable to see. When we speak of a bill of goods "furnished" to a person, we mean simply that they have been ordered for and delivered to such person. It would be a novel doctrine to hold that the vendor's rights could be affected by his subsequent disposal of the goods. So, by materials furnished in and about the building of a house, we understand such as are

furnished to a house in the process of construction, and for the purpose of being incorporated therein. Under the theory of the above cases the vendor could never be sure of his lien, unless he kept a man to watch that the materials are actually built into the vessel, and are not diverted to another purpose. As well might it be claimed that the grocer is bound to trace his supplies to the oven in the cook's galley. This is a stringency of proof required in no other class of cases. Such a construction operates as a constant temptation to fraud, and would serve to entrap, rather than to protect, the rights of those dependent upon it. Unless he be given a lien upon the ship for which the materials were ordered, and to which they are delivered, the libelant is practically remediless; since, if they are put upon other vessels, he has no lien upon them without a previous contract that they shall be so applied. *Rogers* v. *Currier*, 13 Gray, 129; *Read* v. *Hull of New Brig*, 1 Story, 250.

We are by no means without authority in favor of the position we have taken. The earliest case is that of *Wallace* v. *Melchoir*, 2 Brown, (Pa.) 104, in which, under a statute of Pennsylvania providing for a lien upon buildings "by reason of any materials found and provided by any lumber merchant for or in the erecting and constructing such building," it was held to be sufficient that the debt was contracted for and on the credit of the building, that the lumber was delivered at or near the building, at the place pointed out by the defendant, with the understanding of the parties that it was to be used in the erection thereof, although the defendant subsequently, without the knowledge or consent of the plaintiff, sold it to other persons. This case is followed by that of *The Olympic Theatre*, Id. 275, by *Hinchman* v. *Graham*, 2 Serg. & R. 170, and by *Odd Fellows' Hall* v. *Masser*, 24 Pa. St. 507. The rule appears to be the same in Maryland. *Greenway* v. *Turner*, 4 Md. 296. The question was also carefully considered in *Barstow* v. *Robinson*, 2 Allen, 605, in which a lien was sustained upon a ship for spars furnished and wrought for it, by virtue of an express contract to that effect with its owners and builders, and delivered to and accepted by them for that purpose, although the same were never attached to the ship, or removed from the premises of those by whom they were furnished and wrought. In delivering the opinion of the court, Mr. Justice MERRICK observed:

"They [the plaintiffs] furnished the spars, and delivered them to the owner, who accepted them for the purpose for which they were made. They had therefore done everything which they could do to entitle themselves to a lien. It is difficult to see how the owners of the ship could defeat it by their subsequent conduct, for the lien arises by operation of law from the contract, and the complete performance of it by the party who thereby becomes a creditor. It certainly is of no consequence that the owners permitted the spars to remain, after delivery, and after acceptance by them for the use of the ship, in the yard of the vendors."

This case was subsequently cited with approval in *The Orpheus*, 119 Mass. 179.

The substance of this collocation of authorities is that the cases in Pennsylvania, Maryland, and Massachusetts are arrayed against those in

New York, Maine, Connecticut, Illinois, and California, and that, for the reasons I have already given, I think the former enunciate the sounder and more equitable doctrine. It results that libelants are entitled to a decree for the amount of their claim, which, however, will not be entered until the libel is amended.