## Case No. 9,199.

### The MARY BELL.

[1 Sawy. 135.] [2]

District Court, D. Oregon. April 18, 1870.

MARITIME LIENS — SUPPLIES — HOME PORT—FOREIGN PORT—BILL AGAINST VESSEL AND OWNERS.

1. The maritime law does not give a lien upon a vessel for supplies furnished at the home port.

2. The residence of the owner is the home port of a vessel, although she may be enrolled

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

elsewhere; the enrollment is only prima facie proof of the owner's residence, and therefore of the home port.

[Cited in The Albany, Case No. 131.]

3. Supplies furnished vessel in foreign port. To whom or what credit presumed to be given.

[Cited in The Mary Morgan, 28 Fed. 198.]

4. When a bill for supplies is made out against the vessel by name and the owners, it is evidence that credit was given to the vessel, and that the personal responsibility of the owners was not exclusively relied upon.

In admiralty.

Erasmus D. Shattuck, for libellant.
J. W. Whalley, for respondent.

DEADY, District Judge. This suit was commenced by C. H. Myers, on February 9, 1870, to enforce a lien against the Mary Bell, for materials and work furnished to said boat at Portland, by the libellant as a plumber and fitter, between December 19 and January 26, previous. The work and materials are alleged to be of the value of $576.25.

R. C. Smith, intervening for his interest as master and sole owner, appeared and answered the libel. The furnishing of the materials is not denied, but that any lien was given therefor upon the boat which can be enforced in this court, is contested upon two grounds:

1. That the materials and work in question were furnished to the Bell at her home port, and therefore that the admiralty law of the United States does not give a lien therefor.

2. That the owner was present with the boat when the work, etc., was furnished, and on this account the credit is presumed to have been given to such owner and not to the boat, and therefore the admiralty gives no lien upon the boat.

The rule for the determination of the legal question involved in the first objection is as follows:

"By the maritime law of continental Europe, no distinction is made between the cases of domestic and foreign ships, nor between supplies furnished in a home port and abroad. But by the maritime law of England and this country, supplies furnished to a domestic vessel, in a home port, are presumed to be furnished on the personal credit of the owner or master, and do not create a lien which can be enforced in a court of admiralty by proceeding in rem." Jackson v. The Kinnie [Case No. 7,137].

"Material-men, also, who furnish materials or supplies for a vessel in a foreign port, or in a port other than the port of the state where the vessel belongs, have a maritime lien on the vessel as a security for payment of the price of all such materials and supplies." The Belfast, 7 Wall. [74 U. S.] 643. "Such a lien does not arise in a contract for materials and supplies furnished to a vessel in a home port, and in respect to such contracts it is competent for the states, under the decisions of this court, to create such liens as their legislatures may deem just and expedi-

ent, not amounting to a regulation of commerce, and to enact reasonable rules and regulations prescribing the mode of their enforcement." Id. 645, 646.

The Bell was enrolled, under the act of February 18, 1793 [1 Stat. 305], at the port of Astoria, Oregon, on January 10, 1870. The enrollment states that she was built at the Cascades, in Washington Territory, 1865, and that R. C. Smith was her owner and master; and she is styled and described therein as the "Mary Bell, of Portland," but the residence of Smith is not stated, as it should have been. Smith was examined as a witness, and from his testimony it appears that he bought the boat in Portland in June, 1869, and took her to Ranier, on the Columbia river in Oregon, and rebuilt her, and then took her to Monticello, in Washington Territory, where he then and for a long time prior, resided and still resides, and where the boat now is. That about November 10, 1869, he brought the boat to Portland, for the purpose of having her machinery put into her, and her roof tinned, and the plumbing and fitting done for her. The port of Monticello, although within the collection district of Astoria, where the Bell was enrolled, is not within the state of Oregon, neither is it a port of entry or delivery established by law, but only a port or place on the Cowlitz river, near its junction with the Columbia river, where steamboats may, and do arrive from, and depart to ports or places upon the navigable waters of Oregon and Washington Territory.

Upon this state of facts, the first objection to the lien must fail. The only evidence that Portland was the home port of the Bell is furnished by her enrollment. Waiving the consideration of the fact that this enrollment was made after four fifths of these materials had been furnished, at best it is only prima facie proof that the boat belongs at Portland, which may be overcome by evidence to the contrary. Dudley v. The Superior [Case No. 4,115]; Hill v. The Golden Gate [Id. 6,492].

The evidence of the owner is conclusive upon this point. It shows that his residence is without the state, and at the port or place of Monticello, in Washington Territory. This being so, his boat belongs there in fact, although he may have procured her to be otherwise described in the enrollment. Whether a vessel is to be deemed foreign or domestic depends upon the residence of her owners, rather than the port of enrollment, but in the absence of evidence to the contrary, such residence will be presumed to be at the port of enrollment. For the purpose of this suit, and in the port of Portland, the Bell, being owned in Monticello, is to be considered a foreign vessel upon which the admiralty law gives a lien for materials or work. The reason for this is well stated by Mr. Justice Wells, in Hill v. The Golden Gate, supra: "It is important to observe that the character of the vessel is only referred to for the purpose of

ascertaining to whom and to what the credit was given; and in no other respect, so far as regards this case, is it important. If the owners reside in a foreign country, or in another state the material-man is presumed to give credit to the boat and also to the owners, who live so remote, and who are beyond the jurisdiction of the courts of the state. If the owners reside in the same state with the material-man, the latter can easily resort to them for payment, and readily enforce it in the courts, therefore he may well be supposed to give credit to the owners alone. It is apparent, therefore, that the place of enrollment has nothing to do with the credit that is given; and has, therefore, nothing to do with the question of lien."

It is clear that the Mary Bell was owned at Monticello, and that was her home port or place. Therefore in the port of Portland, for the purpose of this suit, she is to be regarded as a foreign vessel, subject to a lien by the admiralty law in favor of material-men.

As to the second objection, the rule of law is substantially stated by Chief Justice Taney, in his dissenting opinion in Thomas v. Osborne, 19 How. [60 U. S.] 38, as follows: By the maritime law, repairs and supplies furnished at the request of the owner, are presumed to have been furnished upon his personal credit, unless the contrary appears. In The Chusan [Case No. 2,717], Mr. Justice Story states the rule more comprehensively, and, in my judgment, more correctly:

"We all know, that, by the general principles of the maritime law, material-men have a three-fold remedy for supplies and materials furnished for a foreign ship. First, the ship itself; secondly, the owners; and thirdly, the master; and neither of these remedies is displaced, except by conclusive proof, that an exclusive credit has been in fact given to one or more of the parties so liable, or to the ship itself."

Here the master and owner are the same person, and it seems to me that in such a case, unless the contrary appears, the presumption ought to be that the party furnishing the supplies dealt with him as master only, and therefore gave credit to the boat. This controversy does not arise between different creditors, as in Pratt v. Reed, 19 How. [60 U. S.] 359, but between the owners and the creditors. That was a case between mortgagees and persons claiming a lien for coals furnished the boat at the request of the owner and master, during a period of nearly two years. The court ruled in favor of the mortgagees, upon the ground that there was no proof of the necessity of procuring the supplies in question, upon the credit of the vessel. There was very little ground for claiming a lien as against the mortgagees, although it was allowed in the court below, but the opinion of Mr. Justice Nelson is an extreme one against the allowance of liens at all. See The Grapeshot, 9 Wall. [76 U. S.] 137. But as between the

owner and material-men, when the supplies are furnished at the request of, or with the knowledge of the former, I do not think the question of whether they were necessary for the vessel, or whether they could have been procured otherwise than upon her credit, ought to arise. The owner should be estopped under these circumstances, from asserting the falsity or impropriety of his own conduct, to the detriment of his creditors.

It only remains, then, to ascertain to whom or what the credit was given when these supplies were furnished. It is apparent, therefore, that the place of enrollment

The facts bearing upon this question, are these: The libellant undertook to furnish the material and labor at the solicitation of the engineer, Wilcox, who seems to have had the immediate charge of putting in the machinery, and fitting up the boat. From him, Myers learned that Smith was owner, and that the boat came from Monticello, where Smith lived. Libellant refused to do the work for Smith on the ground that he had once done some work for him on a steamboat, and was not paid for it. The engineer then assured libellant that he had or would have an interest in the boat, and that the boat was good for it. Upon this understanding, libellant undertook the job, and, as he testifies explicitly, not upon the credit of Smith or the engineer, but that of the boat. The engineer was not examined as a witness. It took about five weeks to complete the work, and once or twice—the first time soon after the commencement of the work—Smith came into Myers' shop, and obtained some of the material himself. At the beginning, Wilcox desired the clerk of libellant to charge the articles to the Mary Bell, and the clerk testifies that he did so; and, further, that about the time the boat was enrolled, and when the material, etc., amounted to $400, he presented a bill to Smith for the amount, and he promised to call and pay a portion of it that afternoon. He also testifies that this bill was made out "to Mary Bell and owners," and that no objection was made to it by Smith on that account or otherwise.

On the stand, Smith stated that he expected the engineer to have procured these supplies at the Wallamet Iron Works, but admitted that the latter informed him at the time that he had employed the libellant. He also admitted that the bill was presented to him as stated by clerk, but could not remember how it was made out. He further admitted that the bill was left with him, and that he supposed he had it somewhere, but not with him. If this bill had not been made out to the Bell it would have been a strong circumstance against the conclusion that the credit was given to the boat. On the other hand, if it was so made out and presented to Smith and not objected to by him, it is pretty certain that not only the credit was given to the boat by the libellant, but that Smith so understood it, and assented to it. That the bill was so made out and presented, we have

the uncontradicted and altogether probable testimony of the clerk. In addition to this, there is the presumption that if the bill was not made out against the boat, Smith would have produced it on the trial. It is the best evidence of the fact. He admits that he had it, and has made no effort to find it. Indeed, for aught that appears, he could lay his hand on it at any time. I think the evidence fully warrants the conclusion that the bill was made out and presented as the clerk states. Where an account for supplies and materials furnished was stated, "Barque Chusan bought of John and George Ring," it was held to be evidence that the credit was given to the vessel, and "to repel the notion that any mere personal responsibility of the owners was exclusively relied on or taken." The Chusan [supra].

Add to this the other circumstances disclosed by the testimony, the refusal of Myers to trust Smith for the work, the explicit pledge of the boat for payment by the engineer, with the immediate knowledge and implied assent of Smith, and the reasonable conclusion is, that the libellant credited the boat exclusively, and also that Smith, by his agent the engineer, obtained the supplies with the direct understanding that the credit was given to the boat and not to themselves, and that the boat was not only tacitly but expressly pledged for the payment of the bill.

The bill is made out in currency, at eighty cents on the dollar; it will be changed to the rate of ninety cents, and a decree given that the libellant recover that amount, with costs and expenses of suit; and in case the same is not paid into court within ten days herefrom, that execution issue therefor against the stipulators in the bond for the delivery of the boat to the claimant.