## THE MARY MORGAN.[1]

*(District Court, E. D. Pennsylvania. June 23, 1886.)*

1. MARITIME LIEN—SUPPLIES AND REPAIRS—FOREIGN PORT.

A New Jersey corporation owned the steamer Mary Morgan, which was registered at the port of Philadelphia, and ran between there and Wilmington, Delaware, touching at Bridgeport, New Jersey, and Chester and Marcus Hook, Pennsylvania. The president, secretary, and treasurer of the company resided at Chester, where the repairs were made and supplies furnished under a contract with the president. *Held* that, as the repairs were made and the supplies furnished under a contract with the owner, the presumption was that the credit was given to him personally, and in the absence of proof of an express lien, none will be given.

2. SAME—NOTE IN PAYMENT.

When a note has been taken in payment for repairs to a vessel, and judgment had thereon, and the vessel has been taken in execution under that judgment, and sold for less than will satisfy it, there can be no lien against the vessel for the balance.

3. SAME—DEBTS CONTRACTED BY OWNER.

*Semble*, that implied liens for supplies and repairs to vessels have not been extended to debts contracted by the owner, saving, perhaps, in exceptional cases, where it appears that the circumstances are such as to forbid absolutely the presumption that the debt was contracted without a pledge of the vessel.

4. SAME—CORPORATION, WHEN FOREIGN.

*Quære*, would a corporation, chartered in one state, with a view to transacting business in another, having its property, office, and officers all there, be, in the sense involved, foreign to the latter state?

In Admiralty.

*William Ward* and *H. R. Edmunds,* for libelant.

*Morton P. Henry,* for respondents.

[1] Reported by C. B. Taylor, Esq., of the Philadelphia bar.

BUTLER, J.   This case is one of unusual interest.   The vessel belonged to the Bridgeport Steam-boat Company, incorporated under the laws of New Jersey.   It was enrolled in the collector's office at Philadelphia, and ran between Philadelphia and Wilmington, Delaware, touching at Bridgeport, New Jersey, and Chester and Marcus Hook, Pennsylvania.   The debt was contracted for alterations, repairs, and supplies obtained to fit it for a voyage or voyages, from Philadelphia to Savannah and back, in the winter of 1885, while navigation on the Delaware was interfered with by ice.   The debt was contracted by the president of the company, who, with the treasurer and the secretary, resided at Chester, where the work was done, and supplies furnished.   The company held all its meetings (except annual meetings of stockholders) at Chester; and, so far as appears, transacted the principal part, if not all, of its business in this state. A note was given for the amount due, on which judgment was obtained in the common pleas of Delaware county, July 9, 1885.   Under an execution issued on this judgment, and another issued by Mr. Bickley, the vessel was sold by the sheriff for $5,000.   The execution of Bickley, who became the purchaser, was before the libelant's in point of time; and whether the latter will be paid from the proceeds of sale is undecided.   The libelant claims payment, and is now contesting the question with Bickley, in the common pleas of Delaware county.

Has the libelant a lien?   The subject of implied lien, in the admiralty, is often a difficult and perplexing one.   The principles upon which the doctrine rests are well defined and easily understood. Their application, however, has been such as to create uncertainty and confusion.   Impressed with the disadvantages attending such liens, —unregistered and secret,—the courts started out with a cautious and sparing application of the doctrine, limiting its operation to cases (or rather classes of cases) where the circumstances not only justify, but demand, the implication of a pledge.   More recently, in apparent forgetfulness or disregard of the reasons on which this limitation was founded, its operation has been extended in some directions, and such a disposition shown to extend it in others, that the courts have come to hesitate, and occasionally disagree, respecting the true line of limitation.   Liens are implied for necessary repairs and supplies, where the debt is contracted by the master in a foreign port.   The implication is founded on the ship's situation and presumed necessities.   The master representing the owner, with authority to pledge the ship whenever his necessities require it, the law implies a pledge, where repairs are made or supplies furnished abroad, on his order.

It will be observed that this statement confines implied liens for repairs and supplies to debts contracted by the *master*.   The rule was so stated uniformly until within a recent period.   Conklin, (volume 1, p. 80,) after defining it in similar terms, says:

"To guard against possible misapprehension it is proper to say that no lien is ever *implied* from contracts of the *owner*. It is only the contracts which the master enters into, in his character of master, that specifically bind the ship, or affect it by way of lien or privilege, in favor of the creditor. When the owner is present, acting on his own behalf as such, the contract is presumed to be made with him, or on his ordinary responsibility, without a view to the vessel."

In *The St. Jago de Cuba*, 9 Wheat. 410, the court says:

"The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to get home for the benefit of all concerned. It is not in the power of any one but the ship-master—*not the owner himself*—to give these implied liens on the vessel. The law marine attaches the power of pledging or subjecting the vessel to material-men, to the office of *ship-master*. The necessities of commerce require that, when remote from his owner, he shall be able to subject the owner's property to that liability, without which it is reasonable to believe he will not be able to pursue his owner's interests. *When the owner is present the reason ceases,* and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel."

In *Thomas* v. *Osborn*, 19 How. 22, the chief justice says:

"Now, if Leach is to be regarded as *owner* for the time, then, by the maritime law, the repairs and supplies furnished at his request are presumed to have been furnished upon his personal credit, unless the contrary is shown; and in that view of the subject Loring & Co. [the libelants] have not, and never had, any lien on the vessel. But if, on the contrary, Leach is to be regarded as the *master*, and as making the contract by virtue of his authority, over the bark in that character, then the repairs and supplies in a foreign port, if necessary to enable the vessel to proceed, are presumed to have been made on the credit of the vessel, unless the contrary is shown. It is immaterial that this is found in a dissenting opinion. There was no question respecting the law. The disagreement was about facts,—the relation which Leach bore to the vessel."

Justice Curtis, speaking for the court, in the same case, said:

"It is true, it [the implied lien] does not exist in a place where the owner is present. But this doctrine cannot be safely extended to the case of an owner *pro hac vice*, in command of a vessel. Practically, his special ownership leaves the enterprise subject to the same necessities as if the master was merely master, and not the charterer."

In *The Grapeshot*, 9 Wall. 136, the rule is similarly stated.

In *The Lulu*, 10 Wall. 203, Justice Clifford says:

"Viewed in any light, it is clear that the necessity for credit must be presumed, where it appears that the repairs and supply were ordered by the master alone, and were necessary."

In *The Emily Sowden*, 17 Wall. 667, the court says:

"The presumption is, in the absence of fraud, that where allowances are made to a captain in a foreign port, to pay for necessary repairs and supplies to enable his vessel to prosecute her voyage, they are made on the credit of the vessel."

In *The Mary Bell*, 1 Sawy. 135, where the master was owner also, a lien for repairs in a foreign port was implied, because, as the court

held, the contract was with him as *master*. But for this, the lien would have been denied.

In *Stephenson* v. *The Frances*, 21 Fed. Rep. 715, and *The Norman*, 6 Fed. Rep. 406, the doctrine of implied lien for repairs and supplies is similarly stated.

The notion of extending it to debts contracted by the *owner* is of recent origin. The wisdom of so extending it is certainly open to grave doubt. Why should it be thus extended? The owner, being present, may authorize an *express* lien. He is hampered by no question of authority. If willing to hypothecate his vessel, he can agree to do so. Such an agreement removes all room for speculation and uncertainty. If the creditor does not require this, why allow him to set up an implied hypothecation,—a pledge, to be implied or not, as the court may understand and construe the circumstances? It is within his power to avoid all doubt and uncertainty, —all necessity for appealing to inferences,—and consequently all danger of mistake. If it be said the master, also, may contract specifically within the limited scope of his authority, it may be answered that while this might have been a sufficient reason for denying the implication of a pledge even for his debts, it certainly is not for extending the doctrine to those of the owner.

Nevertheless, it is asserted in several recent cases that a lien may be implied for such debts contracted by the owner, and in one instance, at least, it is so decided. I find no case in which the supreme court has so determined. In *The Guy*, 9 Wall, 758, the debt was contracted by the owner. The court allowed the lien, without, however, entering into any discussion of this question, which does not appear to have been raised. The only point considered was whether an acceptance taken for the debt, discharged the lien. The facts are insufficiently reported. A reference to the opinion of the court below (1 Ben. 115) shows that the evidence proved the existence of an *express* lien. The court so found, in terms; and it is in this view of the facts that a lien was allowed.

In *The Kalorama*, 10 Wall. 214, it is said by Justice CLIFFORD that a *lien* may exist for such a debt of the owner. It must be inferred that an *implied* lien was intended by the terms used, because it could not be questioned that an express lien might exist. The question, however, was not in the case; and the judge concludes by saying so. "It is quite clear," he remarks, "that the repairs were made and supplies furnished with an *express understanding* between the parties that they were so made and furnished on the credit of the vessel." With this explanation the case loses all importance, except such as may attach to the *obiter dicta* of an eminent judge.

In *The George T. Kemp*, 2 Low. 477, decided in 1876, by the district court for Massachusetts, the question was distinctly presented. No discussion of the subject is found in the opinion. The lien was allowed, the court saying, simply:

"It was formerly held that if the owner is present no lien will be implied. * * * It is not now the law that the presence of the owner, in a foreign port, precludes the possibility of a credit to the vessel, by the general maritime law. This assumption was expressly overruled in *The Guy*, 1 Ben. 112; S. C. 9 Wall. 758; *The Kalorama*, 10 Wall. 204."

These authorities certainly support the proposition that a lien for such debt of the owner is "possible," as here stated. No one has ever questioned that an *express* lien may exist wherever the owner chooses to create it. It was an *implied* lien, however, of which the court was speaking, and the cases cited, as we have seen, do not support (in my judgment) the conclusion reached. I find no other case in which the question can properly be said to have been so decided. In 1883 it arose in *The Frances*, (above cited,) and, after deliberate consideration, the court held that "a known owner, who obtains supplies in a foreign port, not being master, deals presumptively on his personal credit, and no lien will be implied, unless the libelant satisfies the court that there was a common understanding that the ship should be bound." In other words, unless the libelant proves an express lien. *The Metropolis*, 8 Ben. 19, is to the same effect.

This review has satisfied me that the doctrine of implied lien for supplies and repairs has not been extended to debts contracted by the owner,—saving, perhaps, in exceptional cases,—where it appears that the circumstances are such as to *forbid*, absolutely, the presumption that the debt was contracted without a pledge of the vessel. In other words, that the presumption of reliance upon the owner's personal credit still exists, and will prevail, until (at least) such pressing circumstances of necessity are shown as demand a conclusion that the vessel was pledged; as when she is in distress, distant from home, and the owner actually without credit.

Now, repeating the inquiry, was the Mary Morgan subject to lien? Was she in a foreign port? Her owner was a New Jersey corporation. If the statement went no further, she was foreign to Chester. Her owner was, however, engaged in business here, and seems to have had little elsewhere. The principal corporate officers resided here, and here the meetings of the corporation were held. Here, too, the vessel was registered, and the port was visited by her daily. What influence should these facts exert? Do they or not show the owner to have had a virtual residence in Pennsylvania? A corporation cannot change its citizenship under the federal laws. This, however, is not the point involved. If a corporation be chartered in one state, with a view to transacting business in another, having its property, office, and officers all there, would it (in the sense involved) be foreign to the latter state? Could the doctrine of implied lien be invoked for repairs and supplies obtained for its vessels there? Suppose a merchant of Philadelphia has his home across the river in New Jersey,—his stores and property all being here,—would his vessels, on their return voyages, be treated as foreign to this port,

and subject to implied liens for repairs and supplies? Would not such an application of the doctrine ignore the reasons on which it rests? The owner would be liable to suit, and his property to execution, here; and here would be the seat of his financial standing and credit. The case supposed, however, goes somewhat beyond the facts of our case. Whether the Mary Morgan should be regarded as foreign may be open to doubt. In the view I entertain of the case the question need not be decided.

The debt was contracted by the owners. The presumption, therefore, is that credit was given to them personally. This presumption must stand, at least, until answered by evidence sufficient to repel it. I have failed to discover any such evidence in the case. There was no agreement for a lien, nor was there anything in the situation of the vessel or her owners, at the time, to justify the conclusion that a pledge was mutually intended. Regarding the owners as foreign, they were nevertheless very near neighbors of the libelant; and, presumably, as well known financially, as if residents here. It is not important that Mr. Parker testifies that he did not know the corporation. He was unaware, even, that its home was *not* here. Doubtless he supposed it was. He knew its principal officers all resided here, that the vessel was registered, and its business was transacted here. So far from showing that the vessel was in distress, the owners without credit, and a pledge of the property consequently necessary, the circumstances would seem to show, very plainly, that no such necessity existed. Not only was the vessel in a familiar port, but so near home that she had only to cross the river to get there. Nothing stood in the way of her doing this; nor is there anything to indicate that the repairs and supplies could not have thus been obtained on the usual credit in such cases. There was nothing, therefore, in the situation to demand a pledge of the vessel, and consequently nothing to repel the presumption of credit to the owners alone. That the account is charged to the vessel is unimportant. This was doubtless the result of business habit. Nor is it important that the libelant may have contemplated a lien. What he contemplated, without expressing to the owners, does not affect the latter. It is quite probable, notwithstanding what Mr. Parker says, that a pledge was not thought of by any one. In any view, it was clearly unnecessary to the libelant's safety. Why, then, should it have been thought of? Under the laws of Pennsylvania the libelant was entitled to hold the vessel until paid, and the existence of this statute accounts for the habit of charging referred to. The omission to hold the vessel under this statute, which afforded an ample, simple, and entirely certain security and remedy, indicates quite clearly that the credit of the owners alone was relied upon; that an *admiralty pledge* was not thought of. The vessel was not, therefore, in my judgment, subject to a lien.

If she was, however, I think it was discharged by the subsequent sheriff's sale. The acceptance of a note or other similar obligation

for the claim, would not have worked this result. Whether proceeding to judgment for it would, has been doubted in a similar case. *The Kalorama*, 10 Wall. 219. A *sale*, however, of the vessel, is quite a different thing. I can recall no instance in which a creditor may sell his debtor's property a second time for the same debt. He invites the public to purchase, proposing to take the proceeds while the purchaser takes the property. How can he afterwards, in effect, claim the property also? It seems to me that no authority for this proposition can be needed. Probably no direct authority exists; for it is unlikely that such a question has arisen. The instances most nearly analogous are those of mortgage and mechanic's lien creditors who sell the property bound, on judgment subsequently obtained, without reference to the lien, for the same debt; where it is held that the sale discharges the lien, though the debt may remain unpaid. Somewhat similar is the case of a vendor who holds the legal title as security for purchase money, and sells the land on a judgment obtained for the same debt. Although the proceeds may be insufficient to pay him, his hold upon the land is gone.