## The Cumberland.

### Clarke and others *v.* The Cumberland.

*(District Court, S. D. Florida.* June 26, 1886.)

**1. Maritime Liens—Repairs and Supplies—Home Port—Charterer, Master —Notice of Charter.**

Where necessary supplies and repairs were furnished a chartered vessel, where the charterer was owner *pro hac vice,* and part of the time master, and it is not shown that the material-men had knowledge of the charter, *held:*

(1) That at the place of residence of the charterer, as long as he was master, such supplies gave a lien, but after he had appointed another master, and only procured supplies as charterer, there was no lien.

**2. Same—Foreign Port.**

(2) That in a port of another state, bills contracted by master, although charterer and owner *pro hac vice,* also bills contracted by a master in command, not charterer, at a port of the same state as the residence of the charterer, where it was not shown that the material-man had notice of the charter, gave a lien; but where it was shown that the material-man had been informed of the charter and its terms, he is presumed to have furnished subsequent supplies upon the credit of the owner *pro hac vice.*

3. SAME—MONEY BORROWED TO PAY BILLS.
  Money borrowed to pay a bill stands in the same relation to the vessel as the bill paid. If that was a lien, so is the new debt; but not otherwise.

4. SAME—CHANGE OF HOME PORT BY CHARTER.
  When the owner does nothing to inform the public of the charter, courts will not presume knowledge of the change of home port from the residence of the owner to that of the owner *pro hac vice,* so as to relieve a vessel of an otherwise valid lien.

(*Syllabus by the Court.*)

In Admiralty.
*Sparkman & Sparkman* and *G. Bowne Patterson,* for libelants.
*Hugh Macfarlane* and *L. W. Bethel,* for claimants.

LOCKE, J. This steam-ship, owned by the Columbian Iron-works & Dry-dock Company of Baltimore, was chartered by James McKay, of Tampa, Florida, to carry mails, passengers, and freight between that city and Key West for one year, at a monthly rate. The charterer was to pay all running expenses, repairs, and alterations, except repairs for ordinary wear and tear, furnish officers and crew, and have full and complete control of her for the time being, and therefore became owner *pro hac vice.* He was a resident of Tampa, and had been engaged as ship-master and owner there for years. He took command of the vessel the trip out from Baltimore, but, upon arriving at Tampa, another master was put in charge, and he had command at no time while running to Key West, but had, when taking the vessel to Mobile, where he went for repairs, and while running between that port and Pensacola for a time. Her enrollment continued at Baltimore, and she bore that name on her stern; nor was there any notice given or publication made of the charter.

There are now pending against her some 15 demands, by libel or petition, on account of amounts due for the purchase of coal, supplies, provisions, stores, repairs of all kinds, and seamen's wages. A part of these bills were incurred in Mobile, Alabama, part in Tampa, and a part in Key West, Florida. The questions arising are, what effect the charter party had in determining the home port of the vessel, and did bills incurred at the residence of the charterer create a maritime lien?

In all foreign ports, *i. e.,* ports of any state other than that of the usual residence of the owner, expenses incurred by the master for the benefit or use of the ship are presumed to be necessary, and create a maritime lien which is a *jus in re. The Young Mechanic,* 2 Curt. 404; *The St. Jago de Cuba,* 9 Wheat. 409; *Insurance Co.* v. *Baring,* 20 Wall. 159.

The same rule holds good notwithstanding the master is sole charterer or lessee. *The William & Emmeline,* Blatchf. & H. 66. In this case Judge BETTS says:

"The fact that the master is solely concerned in the voyage makes no difference. Third parties dealing with him as master are deemed to act upon the credit of the vessel, and are not chargeable with notice of his secret re-

lations with the owner. The rule applies as well when the master is charterer or lessee of the vessel as when he is in command only on behalf of the owners, unless the creditor has notice of his relation to the vessel." *The New Champion*, 17 Fed. Rep. 816.

Even the charterer, as such, when owner *pro hac vice*, and not master, can bind the vessel in a foreign port. *The India*, 16 Fed. Rep. 262; *The City of New York*, 3 Blatchf. 189.

Where the relations of the charterer to the vessel and her owners are shown to be known to the material-man, or public notice has been given by a change of registry or enrollment, as in the case of *The Norman*, 6 Fed. Rep. 406, or by direct information given, as in *The Francis*, 21 Fed. Rep. 715, the residence of such charterer is accepted as the home port of the vessel, and it is presumed that credit is given him personally. This has been frequently held, but in every case, following *The Golden Gate*, Newb. 308, the knowledge of the creditor seems to have been an important ingredient in the consideration of the question. In truth, wherever the question of a lien on account of the vessels being in a foreign or domestic port has been under advisement, the presumed or apparent knowledge of the creditor is looked upon as the principal question, and the actual state of facts, whenever justice demands, yields to the reasonable belief of the party dealing with the vessel. In *The St. Jago de Cuba, supra,* the question was fully considered. In *The Francis*, 21 Fed. Rep. 717, the residence of Savage was not considered sufficient to dismiss the libel, until it was shown conclusively that the libelant had been informed of the provisions of the charter.

The statute provides what shall be the home port of a vessel, (Rev. St. § 4141 ;) and, notwithstanding the unsatisfactory results arising therefrom, (Justice CLIFFORD in *The Lottawanna*, 21 Wall. 594,) the law is that every port in the state shall be considered a home port, and all other ports foreign. Yet an owner does not cease being the owner by chartering his vessel for a time, nor does a charterer, although he may become owner *pro hac vice*, become owner for all purposes. The term "owner" must be modified by the completion of the description. He can neither sell nor mortgage the vessel, nor use her for a different purpose from that specified. He cannot, like the owner, complete an hypothecation by a mortgage at his residence, no matter how much he may need "wings and legs to the forfeited hull to get back, for the benefit of all concerned." The presumption is against the tacit hypothecation in the home port, for it is always within the owner's power to make an express hypothecation or mortgage, if deemed necessary; but this the charterer is unable to do, and the object for which maritime liens and priority of payment is recognized is defeated. The doctrine of the residence of the charterers being accepted as the home port of the vessel is a fiction of the law for equitable purposes, which will, I am satisfied, be set aside whenever the peculiar circumstances of a case demand. In every case, the decision seems to have been based upon the knowledge of the charter, and the duties of the charterer under it, and the unwillingness of the courts to aid the material-man in obtaining from the owner compensation for that which he

had furnished at the request and for the benefit of the charterer, knowing at the time that the charterer had promised to pay. This knowledge has been presumed from the fact of dealing with the charterer, and not the master; from public notice of the charter by the re-enrollment or registry of the vessel; or from direct information. *The Norman*, 6 Fed. Rep. 406; *The Francis, supra; The Secret,* 15 Fed. Rep. 480; *The William Cook*, 12 Fed. Rep. 919.

Admiralty law does not favor secret liens, contracts, or agreements; and, unless the owner takes some means of giving notice of a charter, the courts will not aid him in resisting liens that have been given by the master when the party furnishing supplies was ignorant of it, because there may have been some unknown arrangement which, when brought to light, changes the home port of a vessel, and consequently her relations with the commercial community. It does not intend to assist owners in having their vessels run at the expense of merchants dealing with her under the mistaken impression, caused by her papers and the name of her home port on her stern. The presumption of her home port is in accordance with these, and the knowledge of their falsity must be shown before it can be presumed of the material-man. It is within the power of the owners who charter to protect themselves by either providing for new enrollment or registry, or taking a bond from the charterers, as was stipulated for, but never given, in this case. I have found no case where any one dealing regularly with the master, without notice that the terms of a charter protected the vessel from hypothecation, has had his lien denied because the debt was incurred in a port of a state in which a charterer resided, nor do I think such has ever been declared as law.

Applying these principles to the several libels before us, there is but little difficulty in arriving at a conclusion. As to the libel of Fine and others, for seamen's wages, there can be no question. It is not denied that the services were rendered as is alleged, nor is there any dispute about amounts. It is true Fine was part of the time master, but he has received on account of wages more than would cover the time of such service, and he had a right to apply such payments to a portion of the debt for which he had no lien. To the seaman there is no foreign or domestic ship, nor does he know owner or charterer. It is his right to look to the vessel for his wages, regardless of any business relations existing between others. Judgment will follow for full amount prayed, with costs.

During the time the vessel was at Mobile, Capt. McKay was master as well as charterer, and there is no question but what it was a foreign port, nor is it shown or claimed that any of the libelants had notice of the charter with one exception, and he not until after the supplies had been furnished. I. R. Edwards furnished supplies and stores, and paid coal bills. He also loaned McKay, as master, money to be paid on certain accounts which were then liens upon the vessel, and a note taken covering the amount. Judgment will be allowed for the full amount, with interest from date of note.

Kling was the proprietor of the machine-shop, and put extensive re-

pairs upon the vessel, at the request of McKay, which he states were necessary. There can be no question of the validity of the lien, nor is there any as to the amount. Judgment in full.

The same may be said of the accounts of John Callaghan for groceries; Chandron & Luscher, paints and oils; William Cottrill, meats and vegetables; P. J. Gibney, repairs on machinery and machinery supplies; Stoutz & Co., dockage, layage in dock, and materials and labor for carpenters' repairs; and the Gulf City Coal & Wood Company, who loaned by its president $250 to pay seamen's wages.

Thus far there has been no difficulty in determining the rights of the parties. There has been no question but what the articles, supplies, or labor were furnished, and were proper and necessary. Some of them have been based upon money loaned, it is true, but this is to be placed on the same footing as the lien to pay which it was borrowed and used. *The Gen. Tompkins*, 9 Fed. Rep. 620; *The Guiding Star*, 18 Fed. Rep. 263; *The Thomas Sherlock*, 22 Fed. Rep. 253; *The Grape Shot*, 9 Wall. 130; *The Emily Souder*, 17 Wall. 666.

But the libel of the Mobile Coal Company presents a more difficult question. Albert G. Danner, president of that company, says that on the fifteenth of August he furnished the Cumberland with 102 tons of coal, and, on December 30th, 40 tons more, and took notes for the same; and that there is still due $509. Capt. McKay, on the other hand, says that in November he bought a cargo of coal from the company, and had it shipped to Tampa by schooner; that he gave his note at 90 days for this cargo; and when it became due he borrowed from Thomas M. Le Barron $300, which he paid on account, and gave his note for the balance, $259, the amount of the note presented. On the fifteenth August the evidence shows the Cumberland to have taken a load of wood at Tampa, and she could not have been in Mobile, and I am satisfied that Capt. McKay is correct in the date of the transaction, as 90 days would bring the time up to the time at which the note that is presented was given. The Cumberland was not at that time at Mobile, but running between Tampa and Key West, and taking coal from Philbrick at the latter port. She was not in need of supplies more than she was obtaining from parties in the ports where she was. Capt. McKay was not master, but was several hundred miles from where she was running. The original note given when he bought the coal is not presented, but he says that he did not state at that time what vessel it was for, and that it was not until he was about to renew it that Danner asked him what vessel had used it, and suggested that he sign the new note as master of the Cumberland, as he was at that time, which he did.

At the date of the original transaction the credit could not have been given to the vessel. They were dealing with the charterer, and in a matter for his benefit only. The giving a new note, signed as master of the Cumberland, to secure a debt which was not at the time a lien upon the vessel, cannot bind her, and so much of the claim as relates to the first purchase of coal must be disallowed. But in December, while the vessel was at Mobile, and McKay master, and she in need of coal to re-

turn to Tampa, the libelant furnished it, and took a note for $182. This amount, with interest from April 2d, will be allowed, with costs.

The libel of Thomas M. Le Barron is for money loaned McKay to pay on account of the original note for the purchase of coal from the Mobile Coal Company, and McKay says he told him the purpose for which he wanted and used it. This can take no better standing as a lien than the debt it paid, and the libel must be dismissed, with costs. *The Guiding Star, supra.*

This brings us to the debts contracted in what, under certain constructions, may be held to be home ports,—Tampa and Key West. It appears that, immediately after arriving at Tampa with the vessel, McKay, the charterer, turned the command of her over to a new master, the change being made June 12th. On the same day parties were seen, and arrangements made, about supplies, and two bills of articles furnished, whether before or after the change of masters it does not appear; nor does it appear that at that time the parties furnishing these supplies had or had not notice of the charter; and I am disposed to give them the benefit of the doubt, and permit them to recover for articles furnished that day. After that McKay ceased to be master, and parties dealing with him could but have taken notice that his only interest was that of charterer, and they were dealing with him as such, and not with the vessel through its officers. Clarke, of the firm of J. D. Clarke & Co., who furnished general supplies, provisions, groceries, paints, and oils, and equipments in the steward's department, during the time the vessel was running from Tampa, says: "I did not know how he [McKay] was running her, but I heard from hearsay that he had the Cumberland chartered." "There was no agreement between him and me that the Cumberland should be held for these supplies." McKay says: "I made arrangements with J. D. Clarke & Co. to furnish her with supplies." "I had charge of securing them. No one got anything except by my direction." "The agreement was that I should settle every quarter. That was when I received my pay from the government." After the twelfth of June, Clarke must have been aware that McKay was no longer master, and that he was dealing with him as charterer only. He delivered on that day $42 worth, and for this he may have judgment, but for the rest of his bill he will have to look to the charterer. It is only when the material-man deals with the master that a lien can be presumed. In other case it has to be established.

The same principle applies to the libel of James A. Moody, who supplied meat during the whole time. He may have judgment for the amount furnished June 12th, but for the rest of the time his business must be presumed to be with McKay, on his personal credit.

In the case of Hayden, there can be no presumption in his favor. He says McKay told him he had chartered the steamer, and made arrangement for him to furnish her with wood. He was not at this time master, and Hayden knew it. His libel must be dismissed. The same in the case of Davis for lightering wood, and of Dillingham and Davis for repairs to machinery at request of McKay when not master, and

when, by the circumstances, they should have been put on their guard to inquire as to his relations with the vessel. Dillingham admits that he was told that McKay had chartered the vessel, and that he did the work at his and his son's request. All the parties admit that there was no express agreement that the vessel should be held for these bills. *The Norman, supra.*

The bill of S. T. Allen was for ice furnished by order of the masters of the vessel by the steward, without any intervention of McKay, or presumption of the relation he bore to the boat. Allen declares positively he would not have furnished it upon McKay's credit. Judgment in full for his bill will be allowed.

In the cases of Clarke, Moody, Hayden, Davis, and Dillingham & Davis, owing to the peculiar circumstances of each case, there will be taxed as costs only the clerk's and marshal's costs, leaving the proctor's fees in each case to be settled by their clients.

In the case of Fogarty & Johnson, who furnished supplies at Key West, upon the orders of the masters in charge, there is nothing to show that they had either knowledge of McKay's charter, or that they were aware that there was an owner or owner *pro hac vice* in the state. There was no circumstance which should be held as putting them upon notice to inquire as to her being a foreign or domestic vessel. She seemed by registry or enrollment, and name of home port on her stern, as foreign, and there has been nothing shown to inform them of the falsity of these evidences. Judgment for the full amount of this bill, with costs, is allowed. *The New Champion, supra.*

The same conclusion would follow in the case of Philbrick, who furnished coal to the amount of $900 during November, December, and January, upon the applications of the masters, were it not for one circumstance. He says he had no knowledge of how the boat was being run; that the coal was furnished upon the credit of the boat, and he would not have furnished it upon the credit of the owners or McKay; but he admits that on the twentieth December he met a party who claimed to be her owner, and informed him of the charter and its terms. This I consider sufficient to put him upon his guard, and cause him to make inquiries as to the truth or falsity of the statement, and, if he did not, he cannot claim to have been acting in good faith, and without notice. Judgment will be allowed for the amount of coal furnished before the date when he received this information, and the rest disallowed.