## THE ALVIRA.

### DE LANO et. al. v. THE ALVIRA (BATCHELDER et al., Interveners.)

#### (District Court, N. D. California. August 7, 1894.)

#### No. 10,849.

1. MARITIME LIENS—LIENS UNDER STATE STATUTES—RULES APPLICABLE.
   Liens arising under local statutes for supplies, materials, and repairs furnished in the home port are assimilated to general admiralty liens, and the principles relating to maritime liens are in general applied to them. But the two are not always exactly alike in all their features and incidents. Thus, the principle that supplies furnished in a foreign port when the owner is with his ship are presumably furnished on his personal credit is inapplicable to liens in the home port, for, the owner being resident there, this would wholly defeat the lien.

2. SAME.
   Under the general principles of admiralty law relating to maritime liens, applicable to the creation of liens under a local statute (Code Civ. Proc. Cal. § 813), to give efficacy to such a lien there must be (1) a necessity for the supplies, materials, or repairs; (2) a necessity for credit; and (3) credit must be given to the vessel. But proof of necessity for the supplies, etc., carries with it a presumption of the second requisite,—the necessity for credit.

3. SAME—NECESSITY FOR REPAIRS—WHEN SHOWN.
   The fact that a freight vessel is chartered to do passenger business, for which she is totally unfitted unless repairs are made, and that liberty to make repairs is given, together with an option to purchase at a fixed price on the expiration of the charter party, is sufficient proof of necessity for the repairs.

4. SAME—RELIANCE ON VESSEL'S CREDIT—BOOK ENTRIES AS EVIDENCE.
   Great importance is not to be attached to the fact that material and repair men gave credit on their books to the vessel alone, or to both the vessel and the party ordering the materials and repairs, or to the latter alone; but the intent is rather to be gathered from all the facts and evidence in the case.

5. SAME—REPAIRS ORDERED BY CHARTERER—WHEN LIEN EXISTS.
   The fact that materials and repairs are furnished upon the order of the charterer, who is personally liable, and that the owner is not personally liable, does not prevent the vesting of a lien under a local statute (Code Civ. Proc. Cal. § 813) when the charterer is owner pro hac vice, and the material and repair men believe him to be the general owner, and have no cause to suspect otherwise. The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396, distinguished.

6. SAME—BURDEN OF PROOF.
   It seems that the rule stated in The Patapsco, 13 Wall. 329, in relation to foreign liens for supplies, namely, that where credit is shown to have been given to the vessel there is a lien, and the burden of displacing it is

upon the claimant, is applicable to a lien claimed under a local statute (Code Civ. Proc. Cal. § 813) for materials and supplies furnished in the home port.

This was a libel by W. W. De Lano and others against the steamer Alvira, J. R. Rideout and others, claimants, claiming a lien for materials furnished and services rendered to the steamer. Interventions were filed by W. H. Batchelder and others to enforce liens alleged to have accrued for services rendered in navigating the vessel, and for materials furnished and work done in repairing the same.

H. W. Hutton, for libelants and interveners.

Andros & Frank, for claimants.

MORROW, District Judge. The libel and interventions in this case were filed to enforce liens against the steamer Alvira for materials furnished and labor performed in repairing and refitting said vessel, and also for services rendered in navigating the same in the Bay of San Francisco. The libel was filed on November 20, 1893, by W. W. De Lano et al., and is brought to recover the sum of $219.14, alleged to be due for materials furnished and services rendered in plumbing and ship-furnishing work done to the vessel, it being claimed that the same constitutes a lien by virtue of section 813 of the Code of Civil Procedure of this state. On November 25, 1893, W. H. Batchelder and some 13 other libelants filed a libel of intervention, each claiming specified amounts for personal services rendered, in various capacities, to the vessel on her trips as a passenger boat, aggregating $509.32. On the same day, Ingler & Atkinson and others filed a libel of intervention for materials furnished and labor performed on the vessel while she was undergoing repairs, liens being claimed therefor under the state law. The claims contained in this intervention are as follows: Ingler & Atkinson, for materials furnished (lumber, moldings, sashes, doors, etc.) and joiner work done to the steamer Alvira, balance due, $718.56; E. G. Buswell Paint Company, paints and painting, $369.95; Humboldt Lumber Company, lumber furnished, $163.21; Puget Sound Lumber Company, lumber, $416.58. On November 27, 1893, Costello & Boucher and others also filed a libel of intervention for materials furnished and work done in repairing the steamer Alvira, and alleged to constitute liens upon the vessel by virtue of the state law. These claims are as follows: Costello & Boucher (Oakland Boiler Works), materials furnished and work done, $340.83; J. M. Prairo, furnishing materials and doing work in blacksmithing and ironwork, $109.05. The claims set out in the original libel of De Lano et al. were not pressed at the hearing, the parties having arrived at some settlement or understanding concerning the same; and those of Batchelder et al. are also eliminated from consideration, they having been satisfied in full, and a dismissal filed, March 27, 1894.

The total demands against the vessel aggregated $2,846.64, but the claims of De Lano et al., for materials furnished, etc., and those of Batchelder et al., for personal services rendered, having been

withdrawn from consideration, the demands outstanding amount
to $2,118.18, for which judgment in rem is sought. The question
to be determined by the court is whether these remaining claims,
which are all for materials furnished and labor performed in re-
pairing and refitting the steamer Alvira, constitute liens against
the vessel by virtue of the state law contained in section 813 of the
Code of Civil Procedure, as follows:

"All steamers, vessels, and boats are liable: * * * 3. For work done or
materials furnished in this state for their construction, repair, or equipment.
* * * Demands for these several causes constitute liens upon all steamers,
vessels, and boats, and have priority in their order herein enumerated, and
have preference over all other demands; but such liens only continue in force
for the period of one year from the time the cause of action accrued."

The materials were furnished, and the labor performed, in repair-
ing and refitting the steamer Alvira, under the following circum-
stances: The vessel was owned by J. R. Rideout, E. V. Rideout,
and Alvira J. Rideout. J. R. Rideout was her managing owner.
She was designed and employed as a freight boat, navigating the
Bay of San Francisco and contiguous inland waters. On the 29th
of July, 1893, she was chartered by the Davie Ferry & Transporta-
tion Company, a corporation formed and existing under the laws
of the state of California. She was chartered for the period of
one year, commencing August 1, 1893, at a monthly rental of $250,
with the option to the charterer to purchase her, at the expiration
of the charter, for $18,000, on certain specified terms. She was to
navigate the Bay of San Francisco, and was chartered to be used
as a passenger boat. The charter party provided, among other
things, as follows:

"The party of the second part [the Davie Ferry & Transportation Company]
to furnish, at its own expense and cost, all fuel, provisions, and necessary re-
pairs, and at the end of this charter to return said steamer to the parties
of the first part, free and clear of any and all obligations, of any name and
nature, which may be incurred on said steamer during the term of this charter,
and also to hold the said parties of the first part harmless for any and all
damages or costs, of every name and nature, for injuries to persons or prop-
erty, caused by said vessel, or persons managing the same, during the continu-
ance of this charter, and, at the expiration of said period aforesaid, the party
of the second part to return and deliver said steamer, her tackle, apparel, and
furniture, to said parties of the first part, or their agent, in as good condition,
reasonable usage and wear excepted, as said steamer, her tackle, apparel, and
furniture were in at the date hereof. * * * It is mutually understood and agreed
by the parties hereto that the party of the second part shall have the right and
privilege to make such alterations in said steamer as they (it) may deem fit and
proper, at its own cost and expense. And in case said steamer shall, during
the life of this charter party, be surrendered and delivered by the party of
the second part to the parties of the first part [the owners of the steamer
Alvira], all improvements made to said steamer shall accrue to, and become
the property of, the parties of the first part, save and excepting such equip-
ments as the said party of the second part shall have furnished."

The steamer Alvira was a freight boat. The Davie Ferry & Trans-
portation Company chartered her to do passenger service. To
be of any use to the company for that purpose it was necessary
that she should be repaired and altered from a freight boat into
one adapted to the transportation of passengers and such inci-
dental freight service as is peculiar to boats engaged in the ferry

business. That such was the mutual understanding of the parties is patent. It was in thus repairing and adapting the steamer Alvira for passenger duty that the expenses for materials and repairs were incurred. It appears that the Davie Ferry & Transportation Company became insolvent some time after the materials had been furnished and the repairs had been completed, and the remaining intervening libelants seek to enforce their claims against the vessel itself, basing their right to do so upon the lien given by section 813 of the Code of Civil Procedure of this state. Therefore, the ultimate fact to be determined is, have the intervening libelants a lien, on the vessel proceeded against, for the materials furnished and the repairs placed by them upon the steamer Alvira?

The claimants of the vessel, as I understand their position, do not insist that the repairs were not necessary to fit the vessel for the business she was chartered to engage in. or that they were not reasonable. But, however that may be, the evidence shows that the materials and repairs were necessary for the purpose for which the vessel was chartered, and were reasonable. The claimants certainly have not shown that they were otherwise; but they insist that no lien accrued in favor of the interveners because the latter, as they claim, gave credit to the Davie Ferry & Transportation Company, and not to the vessel.

As this is the home port of the Alvira, and as her owners reside here, and her owner pro hac vice, the Davie Ferry & Transportation Company, has its place of business here, the intervening libelants, if they recover at all, must do so by virtue of the lien created by the state statute, subject, however, to the principles of admiralty law which obtains in the vesting and enforcement of maritime liens. By the general maritime law, no implied lien accrues in favor of supply or material men upon vessels in their home ports. To secure themselves for such advances, an express hypothecation is necessary. The implied lien only vests where vessels are in foreign ports, and a necessity for supplies or materials exists, as well as a necessity for credit, and such credit is actually given to the vessel. These are well-settled rules of the general maritime law, and have been repeatedly enunciated by the supreme court of the United States. The General Smith, 4 Wheat. 442; The Lottawanna, 21 Wall. 558; The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498. See, to the same effect, The Samuel Marshall, 49 Fed. 754; Id., 4 C. C. A. 385, 54 Fed. 396. This limitation in the general maritime law as to domestic liens gave rise to the state lien laws. Their object was to afford to supply and material men, in the home port of a vessel, the same protection which, by the general admiralty law, was secured to supply and material men upon foreign vessels. As was stated by Judge Hoffman in The Columbus, 5 Sawy. 488, Fed. Cas. No. 3,044:

"It is well known that the state lien laws were passed after the decision in the case of The General Smith, which declared that the existence of liens in favor of material men in the home port of a vessel depended on the local law. The case was generally regarded, however (and, it would seem from the case of The Lottawanna, justly), as deciding that by the general maritime law, as received in the United States, demands of that kind were

not attended by any lien on the vessel. The statutes in question were passed to remedy this defect, and to give to domestic material men the same protection which the maritime law afforded to foreign material men. There is no reason to suppose that they were intended to do more, or that it was sought to withdraw the demands of domestic material men from the operation of the general rules and principles by which maritime liens are governed."

The validity of these state statutes giving domestic liens was recognized by the supreme court in the case of The Lottawanna, supra, and has never since been questioned. In the case of The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, the latest expression by the supreme court of the law on the subject of maritime liens, the following propositions were regarded as settled. Mr. Justice Gray, speaking for the court, said:

"(1) For necessary repairs or supplies furnished to a vessel in a foreign port, a lien is given by the general maritime law, following the civil law, and may be enforced in admiralty. (2) For repairs or supplies in the home port of the vessel, no lien exists, or can be enforced in admiralty, under the general law, independently of local statute. (3) Whenever the statute of a state gives a lien, to be enforced by process in rem against the vessel, for repairs or supplies in her home port, this lien, being similar to the lien arising in a foreign port under the general law, is in the nature of a maritime lien, and therefore may be enforced in admiralty in the courts of the United States. (4) This lien, in the nature of a maritime lien, and to be enforced by process in the nature of admiralty process, is within the exclusive jurisdiction of the courts of the United States, sitting in admiralty. The fundamental reasons on which these propositions rest may be summed up thus: The admiralty and maritime jurisdiction is conferred on the courts of the United States by the constitution, and cannot be enlarged or restricted by the legislation of a state. No state legislation, therefore, can bring within the admiralty jurisdiction of the national courts a subject not maritime in its nature. But when a right, maritime in its nature, and to be enforced by process in the nature of admiralty process, has been given by the statute of a state, the admiralty courts of the United States have jurisdiction, and exclusive jurisdiction, to enforce that right according to their own procedure. * * * According to the great preponderance of American authority, therefore, as well as upon settled principles, the lien created by the statute of a state, for repairs or supplies furnished to a vessel in her home port, has the like precedence over a prior mortgage that is accorded to a lien for repairs or supplies in a foreign port under the general maritime law, as recognized and adopted in the United States. Each rests upon the furnishing of supplies to the ship, on the credit of the ship herself, to preserve her existence and secure her usefulness, for the benefit of all having any title or interest in her. Each creates a jus in re,—a right of property in the vessel,—existing independently of possession, and arising as soon as the contract is made, and before the institution of judicial proceedings to enforce it. The contract in each case is maritime, and the lien which the law gives to secure it is maritime in its nature, and is enforced in admiralty by reason of its maritime nature only. The mortgage, on the other hand, is not a maritime contract, and constitutes no maritime lien, and the mortgagee can only share in the proceeds in the registry after all maritime liens have been satisfied. It would seem to follow that any priority given by the statute of a state, or by decisions at common law or in equity, is immaterial, and that the admiralty courts of the United States, enforcing the lien because it is maritime in its nature, arising upon a maritime contract, must give it the rank to which it is entitled by the principles of the maritime and admiralty law."

Although the facts of that case are not analogous to those in the case at bar, the question there being whether a prior recorded mortgage of the vessel had priority over liens created by the state

statute, yet the general remarks of the learned justice are in point, as showing that liens granted by state statutes are placed on the same footing with liens recognized by the general admiralty and maritime law. But, while the courts of admiralty are held to have exclusive jurisdiction to enforce these state liens upon vessels, yet, in enforcing them, they do not adopt and apply these statutes in all their terms; they do not necessarily enforce all their provisions; nor do they follow the construction placed upon them by the state tribunals. In applying and enforcing them they subject them to the general principles of the admiralty and maritime law, or rather to those principles of the admiralty law which obtain and apply to maritime liens. In other words, they adopt the local statutes in so far as they create a lien of a maritime character. The Guiding Star, 18 Fed. 268. While it was intended to place domestic liens on an equal footing with foreign liens, yet this, of itself, does not render foreign and domestic liens for supplies and repairs in all respects the same. The lien given to a vessel deemed to be foreign is not always, in all its features, exactly similar to, or a perfect counterpart of, the lien provided by state statutes to vessels in their home port. The two are sometimes qualified by differences which even the application of the broad and general principles of admiralty law do not, in all cases, harmonize. As was said by Judge Hoffman in The Columbus, supra:

"In the case of The Young Mechanic, 2 Curt. 504, Fed. Cas. No. 18,180, Mr. J. Curtis considered very carefully the nature and effect of a similar lien created by the laws of Maine. He held that it was a maritime lien, conferring a jus in re, and constituting an incumbrance on the property, and existing independently of the process used to execute it. He further held that the statute conferred on mechanics and material men such a lien on domestic vessels as the general admiralty law had previously allowed to them on foreign vessels. Of course, it was not intended by this decision to hold that the liens were identical in every respect. The state laws may prescribe the mode in which the lien they create may be acquired or perfected. They may also limit their continuance to a specified period. But, except where the state laws otherwise in terms provide, the lien is to be regarded as maritime, and to be subject, as to its origin and incidents, to the same rules by which liens on foreign vessels are governed."

The two liens not being always identical, the general principles of the maritime law which apply to maritime liens cannot always be unqualifiedly applied to the liens created by the state law. The court of admiralty must, therefore, often discriminate between the two. For instance, it is the law, by the weight of authority, that where a vessel is in a foreign port, and her owner is with her, supplies or materials furnished, or repairs done, to her, are presumably furnished on the personal credit of the owner, and therefore no lien accrues in favor of the supply or material man. The Mary Morgan, 28 Fed. 196, and cases there cited; Stephenson v. The Francis, 21 Fed. 722; The Now Then, 5 C. C. A. 206, 55 Fed. 523; The St. Jago de Cuba, 9 Wheat. 416. But, however pertinent the reasons may be for the existence of such a rule respecting vessels in foreign ports, they do not apply to the liens given in the home port by state statutes. Domestic liens for supplies or repairs furnished at the request of the owner or of his agent would never obtain in a

home port, were the same principle which is held to apply to vessels in foreign ports to be enforced, for the very idea of a "home port" assumes that the owner resides there or transacts his business there. We thus see the difficulty that would arise if this principle by which maritime liens are measured and governed where the vessel is in a foreign port, and her owner is with her, were attempted to be applied, in its full terms, to local liens. Manifestly, the very object of the local lien—the lien itself—would be defeated. It is this attempt to apply in all cases general principles that tends to confuse the subject of local liens. The peculiar facts and equities of each case must often go far in determining the inherent justness of claims for supplies, materials, or repairs furnished in the home port. The observations of Locke, J., in The Cumberland, 30 Fed. 451, are directly in point. He said:

"The doctrine of the residence of the charterers being accepted as the home port of the vessel is a fiction of the law for equitable purposes, which will, I am satisfied, be set aside whenever the peculiar circumstances of the case demand. In every case the decision seems to be based upon the knowledge of the charter, and the duties of the charterer under it, and the unwillingness of the courts to aid the material men in obtaining from the owner compensation for that which he had furnished at the request and for the benefit of the charterer, knowing at the time that the charterer had promised to pay."

Keeping in mind, therefore, the obvious purpose of state laws in giving the lien, viz. to give to domestic supply and material men the same protection which the maritime law afforded to foreign material and supply men, and remembering that though foreign and domestic liens are, in their general features, similar, yet they are not identical, and giving the proved facts in this case their proper weight, we proceed to inquire, what are the general principles of admiralty and maritime law which properly obtain and apply to the liens claimed in the case at bar?

The general principles of admiralty law which must exist to give efficacy to a maritime lien for supplies, materials, or repairs are the following: (1) There must be a necessity for the supplies, materials, or repairs; (2) there must also be a necessity to obtain credit; and (3) credit must have been given to the vessel. Proof that the supplies, materials, or repairs were necessary carries with it a presumption of the second requisite,—that there was a necessity for credit; the necessity for credit being presumed to exist where the supplies, etc., were necessary and are proved to have been such. The Grapeshot, 9 Wall. 129. In that case the supreme court say:

"Where proof is made of necessity for the repairs or supplies, or for funds raised to pay for them by the master, and of credit given the ship, a presumption will arise, conclusive in the absence of evidence to the contrary, of necessity for credit."

The third requisite, so far as this case is concerned, will determine whether the intervening libelants have a lien or not. There is no difficulty in arriving at a conclusion as to the first two requisites. That the materials and repairs were necessary is abundantly established by the evidence. The vessel was chartered to do passenger service. At that time she was fitted up and was being run

as a freight boat. Unless altered, she was totally useless to the
Davie Ferry & Transportation Company. I find, therefore, that
the materials and repairs furnished were necessary for the purpose
for which the vessel was chartered, and that the charges for the
same, so far as appears from the evidence, were reasonable. But
the question of difficulty is, to whom did the intervening libelants
give credit,—to the vessel or to the Davie Ferry & Transportation
Company?

The intervening libelants all testify that they were not informed,
and did not know, who were the actual owners of the vessel, nor did
they know that the relation which the Davie Ferry & Transportation
Company bore to the vessel was simply that of charterer. It is
true they did not inquire. The materials and repairs were fur-
nished at the instance of John McGrath and Capt. Ebert. The lat-
ter was the general manager of the company, and ordered some of
the materials, but it seems that McGrath did most of the ordering.
When preparations were first being made to carry on the repairs
and alterations, Capt. Ebert accompanied Mr. McGrath to several
of the intervening libelants' places of business, and introduced the
latter, telling them to comply with such orders as McGrath might
give them for materials and repairs. McGrath was employed by
the company, and acted as a sort of foreman joiner. As such he
had charge and superintended the repairs and alterations which
were made on the Alvira. He testifies that he was authorized to
order such materials or work as he desired. As to what he said
when ordering these materials and work, he testified as follows
on cross-examination:

"Q. When you purchased these materials, did you tell them who you were
purchasing for? A. Yes, sir. Q. Who,—the Davie Ferry Company? A. Of
course: the steamer Alvira, or the steamer Rosalie, or the Frank Silvia, or
for 'wharf,' or 'general repairs,'—whatever it was. I stated very distinctly
what the materials was for. * * * Q. How was that? You told them
that you wanted them for the Davie Ferry Company? A. I presume they
understood that themselves. I ordered that stuff for the boats. The Court:
Q. The question is, what did you tell them? A. They were keeping account
with the Davie Ferry Company. Q. Did you tell them that it was for the
Davie Ferry Company? A. I presume I mentioned the Davie Ferry Com-
pany, for steamer so and so. They knew I was foreman for the Davie Ferry
Company. I did not need to mention it."

On redirect examination he testified:

"Q. When you went and ordered that stuff from these different people,
did you tell them any more than the steamer it was for? A. No, sir; I said
it was for the steamer Alvira, or the steamer Rosalie, or the steamer Frank
Silvia, or the wharf, or whatever it was for. Q. Is that all you ever told
them? A. That is all I ever told them. Q. Did you ever tell them at any
time that the steamer Alvira would not be responsible for that? A. No, sir;
I did not. Q. Did you ever tell them at any time that the Davie Ferry &
Transportation Company was going to pay for it? A. No, sir. Q. All you
ever told them was the steamer for which this stuff was for? A. Exactly;
distinctly the steamer it was for, or wharf, or shed, or waiting room, or
whatever it was for."

Capt. Ebert was not produced as a witness by either side. The
claimants do not produce a single witness to impeach the testimony
of McGrath. On the other hand, that witness is corroborated by

the interveners, who testified as to the fact that the materials and repairs were ordered for the vessel particularly, and not for the company generally, and that McGrath said nothing whatever to them about the vessel not being liable for the expenses. Nothing appears in the evidence to the effect that McGrath or anybody else ever advised the interveners—certainly not until after the repairs had been fully completed—that the vessel was under charter, and that the Davie Ferry & Transportation Company was the charterer, and not the owner, of the vessel; and the evidence discloses no fact or facts which, either directly or indirectly, were calculated to put the interveners, as reasonable men, upon inquiry. They were told to send the bills to the Davie Ferry & Transportation Company, who would pay them, and in each instance, according to the testimony of McGrath and of the interveners, they were told that the materials or repairs were for the vessel Alvira, particularly designating her. To the entries in the books or ledgers, and the bills, of the material men, I do not attach much importance one way or the other. As a rule, they seem to have contained the name of the company and the name of the vessel,—Alvira. But the latter was omitted in some instances, and in others the name of the company was left out. However, as just stated, I do not attach particular importance to these entries. While the entries are entitled to some weight, and, in connection with other facts, may serve to assist in the inquiry, yet they are not always deemed reliable evidence, and other judges, conscious of the opportunity afforded to unscrupulous supply or material men of making evidence for themselves, have inclined to a rule which, under ordinary circumstances, or the peculiar facts of a particular case, would give but little weight to such evidence. In the language of Taft, Circuit Judge, in The Samuel Marshall Case, 4 C. C. A. 392, 54 Fed. 403:

"The fact that the supplies were charged against the vessel on the books of the libelants is evidence only of a self-serving practice, which has no particular weight in the determination of the question. As was suggested in the cases of Beinecke v. The Secret, 3 Fed. 665, 667, The Francis, 21 Fed. 722, The Suliote, 23 Fed. 919, and The Mary Morgan, 28 Fed. 196, 201, such practice is not infrequently followed in order that the person who furnishes the supplies may not deprive himself of the lien, if he otherwise is entitled to it."

Nor would the mere fact that the entries were made solely against the company, without mentioning the name of the vessel, of itself, under the circumstances of a particular case, have much weight to show that credit was intended to be given to the company, and not to the vessel. The supply or material man may have made such an entry simply to indicate who was to pay the bills, intending all along to give credit to the vessel. In other words, the intention of the parties must be gathered from all the facts of the case. In the case at bar the interveners all say that they intended to hold the vessel; that they thought the vessel was good for the materials and repairs; that they simply sent their bills to the Davie Ferry & Transportation Company, upon the latter's request to do so, for payment. The mere fact that they looked to the company for the payment of their bills does not, of itself, show that they did not

intend to give credit to the vessel. Somebody must pay the bills. The ship itself—the inanimate thing—cannot do so. "Goods, as goods, cannot offend, forfeit, unlade, pay duties, or the like, but men whose goods they are." Vaughan, C. J., in Sheppard v. Gosnold, Vaughan, 159, 172. Nor, I take it, would the fact that they gave personal credit prejudice their lien, provided it satisfactorily appeared that they gave credit to the vessel as well. And I think it may be safely said that in almost every case, in domestic ports, a personal credit incidentally accompanies the credit given to the vessel. As was said by Judge Benedict in The India, 14 Fed. 476:

"A material man may, and generally does, rely upon a personal credit as well as the credit of the vessel. The question here is whether the coals were furnished upon personal credit alone."

Aside from the testimony of McGrath and of the interveners, the following testimony of one of the material men is significant as tending to show that credit was intended to be given to the vessel. C. L. Ingler, a member of the firm of Ingler & Atkinson, who furnished the Alvira with shipwork, doors, windows, sashes, moldings, and such like, to the value of $1,307, of which, however, $588.49 has been paid by the Davie Ferry & Transportation Company, leaving a balance due which is one of the items of this suit, testifies as follows:

"Q. Who did you look to for your money? A. I looked to the boat. Q. You knew where it (the material) was going? A. I knew where it was going, on the principle as we do with a house. We always lien a house when it is not settled for within a certain period of time. Q. You knew, of your own knowledge, that this stuff actually went in her? A. Yes, sir.

On cross-examination he testified as follows:

"Q. You say this was ordered by the Davie Ferry Company. Who appeared on the behalf of the Davie Ferry Company to order this? A. Captain Ebert and Mr. McGrath. Q. What did they say when they first came there after they introduced the subject? How did they introduce the subject in regard to the purchase? A. Captain Ebert came along with Mr. McGrath, and stated that the Davie Ferry Company was about to overhaul this boat, and wanted me to furnish some material for it; and he says, 'Bill it to the Davie Ferry Company, and the bills will be paid from thirty to sixty days; in any event, the vessel is good for it. I told them I understood it was; and we arranged to furnish the material in that way and manner. Mr. McGrath ordered most all of the work and checked up all the bills. All the work went on this boat. Q. You say he said, 'In any event, the vessel is good for it'? A. Yes, sir. Q. Did he volunteer that statement himself? A. Yes, sir. Q. Did you make any inquiry of him in regard to his relations to that vessel? A. No, sir. Q. Then you sold it to him on the understanding that it was to be billed to the Davie Ferry Company on a credit of from thirty to sixty days? A. Yes, sir. Q. And that the Davie Ferry Company was to pay for it? A. That was my understanding of it at the time."

On redirect examination he states that he furnished the materials on the promise that the boat would be good for it. He simply looked to the company for the payment of the bills; he did not look exclusively to it for the money.

Another fact of some significance is that there were credits for the materials and supplies of 30 to 60 days' time. The company had been organized but a short time previously, and it does not appear

likely that materials would be furnished, and repairs made, in amounts ranging all the way from $109.05 to $1,307, with no other security than the bare promise of the company to settle in 30 to 60 days' time. The only security possessed by the interveners was the lien given by the state law upon the vessel. Taking all the facts of the case into consideration, I cannot but conclude that they intended to give credit to the vessel, and not to rely exclusively upon a personal credit of the company.

In the case of The Patapsco, 13 Wall. 329, a principle of admiralty law was declared which, while it related to supplies furnished a ship in a foreign port, appears to be applicable to this case. It was held that, where the credit is given to the vessel, there is a lien, and the burden of displacing it is on the claimant of the vessel. "He must show affirmatively that the credit was given to the company, to the exclusion of a credit to the vessel." This the claimants have certainly failed to do in the case at bar. The libelants proved, to the satisfaction of the court, that the repairs were necessary for the purpose for which the Alvira was chartered, and that they were reasonable; and, further, that they intended to give credit to the vessel, and not to the Davie Ferry & Transportation Company exclusively. According to the rule laid down by the supreme court in the case cited, the burden then lay on the claimants to establish affirmatively that credit had not been given to the vessel. Failing in this, the lien attached.

This view of the law would dispose of the case, but counsel for claimants advances another proposition. It is contended that the lien given by the state law could not attach because the expenses for the materials and repairs were incurred, not by the claimants (the owners), but by the Davie Ferry & Transportation Company (the charterer); that the materials and repairs were primarily for the benefit of the charterer; and that the latter, and not the vessel, is personally liable for the same. The interveners maintain that they are, notwithstanding, entitled to the domestic lien, because they furnished the materials and completed the repairs in good faith, not knowing or being informed that the vessel was under charter, or who the owner or owners were. The rights and liabilities of charterers are succinctly stated by Mr. Justice Curtis in Webb v. Peirce, 1 Curt. 108, Fed. Cas. No. 17,320, in the following language:

"When the possession, command, and navigation of the ship are let by the general owner, the hirer becomes owner pro hac vice; the possession is his; the employment is his; the contracts respecting that employment are his; the master, if he employs one, is his agent; if he commands the vessel himself, he acts on his own account. In the language of Chancellor Kent (3 Comm. 138), 'this may be considered the sound and settled law on this subject.'"

But the fact alone that a vessel is operated by a charterer does not prevent, in proper cases, a maritime lien for supplies, materials, or repairs from attaching. It is well settled that in foreign ports the charterer may create liens on the vessel,—may hypothecate her under the same conditions as the general owner could. Their rights

in that regard are identical. In such case "the whole object of giving admiralty process and priority to privileged creditors is to furnish wings and legs to the vessel to get back for the benefit of all concerned; that is, to complete her voyage." Section 42, Hen. Adm. Jur. & Proc., contains the following:

"It is said that, except in bottomry and salvage, the lien exists as ancillary to the payment of some personal claim. While this is true of claims arising out of contracts, the maritime law in cases of torts treats a vessel as an actor or sentient being having a personality capable of doing wrong, and the lien can be enforced against the vessel as a delinquent, without regard to the question of ownership or agency; and in cases of contract, where the general owner intrusts the special owner, either as master or hirer, with the entire control and management of the ship, he thereby assents to the creation of liens binding on his interest in the vessel as security for the performance of contracts for affreightments and for supplies furnished in the course of the lawful employment of the vessel, and to liens for injuries to cargo and for collision, for which he may not become personally liable."

This would seem to dispose of the contention of counsel for claimants that, as the general owner was not originally or personally bound for these materials and repairs, therefore the vessel could not be.

In the case of The India, 14 Fed. 478, 16 Fed. 263, previously referred to, which was a case of coals furnished to a vessel in a foreign port upon the order of the agent of the charterer, the latter resided in New York, and the coal was furnished in Philadelphia. It being the port of a different state, it was, for that reason, by virtue of The General Smith Case, supra, considered as foreign for the purposes of applying the principles of the admiralty law. Judge Benedict held that the lien attached to the vessel, although the general owner could not be held personally liable. He said:

"It is not essential to the creation of a lien for supplies furnished a foreign ship that the supplies be ordered by the general owner or his agent. When the general owner of a ship intrusts her entire possession and control to another as her special owner, he thereby assents to the creation of liens upon the ship for necessaries supplied by order of the special owner, and, when such necessaries are so supplied upon the credit of the ship, the ship is bound, although no personal liability is incurred by the general owner."

In that case the court treated of a lien accruing in a foreign port; but there does not appear to be any good reason why the same principle of admiralty law, that one who intrusts another with the full possession, control, and management of a vessel is deemed to consent that liens for necessary supplies, materials, or repairs may be created on such, should not apply, in proper cases, in determining whether domestic liens have or have not attached, and with entire justice. An owner who charters his vessel must be deemed to consent that such liens may accrue. He is charged with notice that they may accrue. This, it seems to me, is nothing but fair and equitable to the domestic supply or material man, who may know nothing of the real relation existing between the general and special owner, and be deceived by taking the ostensible owner for the real owner. In other words, as to innocent supply men, the general owner is subject, in proper cases, to the principle of an equitable estoppel. But, by giving notice to the supply or material man

of the fact that the vessel is in the hands of a charterer, the general owner may protect his property from maritime liens. Therefore, the general principle that the owner is deemed to consent to the accruing of liens where the entire possession, control, and management of a vessel is intrusted to another is qualified by this condition: If the supply or material man know of the charter or the relation in which the ostensible owner holds, or if he be advised of the real status of such relation by the general owner or by the charterer, or is placed in possession of such facts as would put, or ought to put, a reasonably prudent man on inquiry, the presumption arises that the supplies, materials, or repairs were furnished upon the credit of the charterer himself, and there is no lien. And the onus lies on the supply or material man to remove this presumption. The reason for this is plain. Courts of admiralty do not favor secret liens; otherwise, owners would often fall an easy prey to liens created by injudicious or unscrupulous charterers. Moreover, the supplies, materials, or repairs are generally furnished exclusively for the benefit of the charterer; at least it may be said that he is the party primarily benefited thereby, the owner, as a general rule, being only incidentally benefited, if at all.

But in the case at bar the liens cannot be considered as secret, for the reason that the owners knew all the time the exact situation of affairs. They knew that repairs and alterations would have to be made, and that they were being made. In fact, it is in evidence that Capt. Rideout himself, the managing owner, visited the vessel while the repairs were in progress, and even went so far as to suggest some improvements or modifications of the work. The owners, therefore, knew as well as the charterers that the repairs and alterations were being made, and yet not one of them ever gave notice to any of the interveners that they would not be liable for any liens that might accrue from such repairs and alterations. They did not, so far as the evidence discloses, even apprise any of the interveners of the character in which the company operated the vessel. It is testified by Capt. Rideout that he did make some effort to give notice to several of the material men, but this attempt proved ineffectual. It was, confessedly, not given to any of the interveners who now press their claims, and certainly not until after the materials had all been furnished and the repairs entirely completed. Had the owners not known that these materials and repairs were being furnished, a different phase of the matter would be presented; but it appears affirmatively that they were fully aware of what was being done. Can they now be heard to complain, when, with full knowledge of all these facts, they tacitly assented to these material men placing over $2,000 worth of repairs on the steamer? Are they not estopped, as against these material men, by their own laches, when, having had ample opportunity to protect their property from the vesting of maritime liens, they either omitted or declined to take the necessary steps to secure such protection? To refuse to enforce these liens, in the face of the conduct of the owners, would not be equitable, it seems to me, under the

circumstances, nor would it be consistent with the object of the statute in providing the domestic lien.

But counsel for the claimants contend that the duty devolved upon the material men to find out who the owner of the vessel was, and the relation the vessel bore to the Davie Ferry & Transportation Company. But what was there which, from all the facts in the case, it may be said, placed the material men on inquiry? The vessel had been chartered by the Davie Ferry & Transportation Company for the term of one year. One of the stipulations of the charter party gave the charterer the option of purchasing the vessel for $18,000 at the expiration of the charter party. It also provided that repairs and alterations might be made by the charterer, and that no lien should accrue therefor. The material men knew nothing of these arrangements or stipulations in the charter party, nor, so far as the evidence shows, did they know that the vessel was chartered at all, or that the company was anything more or less than the general owner of the vessel. Certainly, if complete possession, management, and control are indicative of ownership, the Davie Ferry & Transportation Company was the ostensible owner. To be sure, the interveners did not make inquiry for the purpose of being informed as to the actual fact. But, in view of the circumstances of this case, they were hardly called upon to do so. There was nothing calling for an inquiry. To all appearances the company was the owner. It ran the vessel; hired the captain, officers, and crew. In fact, the captain employed was a son of the managing owner. The company paid the running expenses; engaged to make the necessary repairs and alterations. Everything seemed regular. There was nothing, so far as the evidence discloses, which would tend to arouse the suspicions of a reasonably prudent person; nothing which might be calculated to place one on inquiry. Certain it is that nothing that the owners ever said or did can be regarded as any notice to the material men, or as being sufficient to put them on inquiry. In view of all the facts of this case, I do not think that the interveners' failure to institute inquiries, when not in possession of such facts as would tend to alarm a reasonably prudent person, and impose the duty of ascertaining the condition of affairs, can be said to justify a court, governed by equitable principles, in refusing to enforce the liens claimed, particularly when the owners, who did know the exact situation of affairs, failed to protect their property by giving timely notice to the material men. In the absence of notice, or of facts sufficient to put them upon inquiry, the interveners had a right to rely upon the apparent authority and ownership of the Davie Ferry & Transportation Company. In The Cumberland, supra, Judge Locke used the following language:

"In truth, wherever the question of a lien on account of the vessels being in a foreign or domestic port has been under advisement, the presumed or apparent knowledge of the creditor is looked upon as the principal question, and the actual state of facts, whenever justice demands, yields to the reasonable belief of the party dealing with the vessel. * * * Admiralty law does not favor secret liens, contracts, or agreements; and, unless the owner takes some means of giving notice of a charter, the courts will not aid him in resisting liens that have been given by the master when the party furnishing supplies was ignorant of it, because there may have been some

unknown arrangement which, when brought to light, changes the home port of a vessel, and consequently her relations with the commercial community. It does not intend to assist owners in having their vessels run at the expense of merchants dealing with her under the mistaken impression caused by her papers and the name of her home port on her stern. The presumption of her home port is in accordance with these, and the knowledge of their falsity must be shown before it can be presumed of the material man. It is within the power of the owners who charter to protect themselves by either providing for new enrollment or registry, or taking a bond from the charterers, as was stipulated for, but never given, in this case. I have found no case where any one dealing regularly with the master, without notice that the terms of a charter protected the vessel from hypothecation, has had his lien denied because the debt was incurred in a port of a state in which a charterer resided, nor do I think such has ever been declared as law."

The same judge, sitting as a member of the circuit court of appeals for the fifth circuit, in the case of Norwegian S. S. Co. v. Washington, 6 C. C. A. 313, 57 Fed. 224, said:

"The duties of consignees or agents of ships, or the agents of charterers or owners, are so similar and undistinguishable that without some positive knowledge of their relations, contracts, and agreements it is impossible to determine to which class an agency may belong; and the fact that a merchant purchases supplies, or procures services to be rendered a vessel, raises no presumption that he therefore sustains relations with the owners that make him responsible, and relieve the vessel from a lien. In the great majority of instances, in ordinary practice, the material man or stevedore contracts with, and takes his bill for payment to, the agent of the ship, whether he represents the owners or the charterers, without the intervention of the master; but by so doing he does not abandon his right to look to the vessel in event of a nonpayment. It cannot be presumed or expected that he can be informed as to the exact provisions of the charter, or the responsibilities of the parties, in each particular case. Examining this case in the light of these general principles, we fail to find any affirmative proof that the libelant was informed of the character or conditions of the charters, or either of them, or the responsibilities of the vessel or charterers, or in any way gave the agent personal credit, to the exclusion of the vessel, or that the circumstances are shown to be such that he should be held to have done so. The final charter—the one under which he was loading at this time—specified distinctly that the vessel should pay for the stevedoring; and, had he known of this, it was in no way compulsory upon him to go back of that, and find to whom the term 'vessel,' there used, referred,—whether owners or previous charterers; and, were he ignorant of the provisions of either charter, it cannot be presumed he knew of, or contemplated, any paymaster but the vessel. * * * It is not enough to show that an agent who employs labor or procures supplies for a vessel is a charterer, and under that charter liable for the bills incurred, but it is necessary that the creditor also be aware of the relation, and furnish the supplies or services with such an understanding."

The case of The John Farron, 14 Blatchf. 24, Fed. Cas. No. 7,341, decided by Johnson, J., in the circuit court for the second circuit, is quite similar in principle to the case at bar. It was held that a domestic lien attached, under the following circumstances, somewhat analogous to the present case. The statute of New York of April 24, 1862 (Laws 1862, p. 956, § 1), gave a lien on a vessel for a debt contracted by her "master, owner, charterer, builder, or consignee," "or the agent of either of them," within the state, on account of labor or materials furnished in the state for repairing such vessel. H., the owner of a vessel, contracted in writing to sell her to S., and delivered possession and control of her to S., who, as her apparent owner, contracted in New York, upon her credit, a debt for repairs

to her. In the contract of sale it was agreed that S. should have possession, and might make repairs, but that such repairs should not be a lien on the vessel or a claim against H.; but the creditor had no notice of such agreement. The case had been appealed from the district court, where it was held that the lien could not attach. Subsequent to that decision, and before the case was determined in the circuit court, the supreme court decided The Lottawanna Case, upholding the validity of domestic liens. In view of this fact, and of the further fact that the owner had intrusted the possession of the vessel, under the contract of sale, to the prospective vendees, by which they were enabled to appear as owners to third persons, Judge Johnson held that the lien should be enforced against the vessel, although the owner incurred no personal liability. The learned judge said:

"It was not the intention of the parties that the title of the vessel should pass from Hamill to Stevens and Gardner by the delivery of her into their possession; but it was their purpose to put her under their entire control, leaving the unfulfilled portion of the contract to be carried out in the future, by the completion of the bill of sale and the execution of the mortgage. Stevens and Gardner, being thus in possession, by the consent of the owner, were enabled to appear as owners to third persons, and thus to obtain credit for the vessel as her owners, or through Stevens as her master. * * * The agreement between Hamill and Stevens and Gardner, that they should subject the vessel to no lien by repairs, cannot prevent a lien occurring as to persons having no knowledge or notice of that agreement; and this appears to have been the fact in respect to the libelant."

The counsel for claimants object that, in the above case, the statute of New York mentioned the classes of persons who could contract a debt which would become a lien on the vessel, viz. "master, owner, charterer, builder, or consignee," "or the agent of either of them;" and as the debt in that case was contracted by the charterers, and the statute of this state makes no such specification of persons competent to incur debts for which liens would attach, that therefore the case is different in principle from the case at bar, and is not of authority. But I do not think the distinction is well taken, for by the law of this state, previously referred to, a lien attaches to vessels "for work done or materials furnished in this state for their construction, repair, or equipment." The preceding subdivision of the same section, relating to "supplies" and "services," gives a lien when such are furnished and rendered "at the request of their respective owners, masters, agents, or consignees," thus specifying the persons at whose instance debts for "supplies" or "services" may become liens. The subdivision relating to liens "for work done or materials furnished in this state for their construction, repair, or equipment," it will be noticed, makes no such specification. This very fact disposes of counsel's objection, for the effect of the subdivision is to make all persons, who possess the authority, competent to contract for work or materials, including, of course, charterers. Therefore, whatever question there may be whether, under the peculiar phraseology of the local lien law, a "charterer" would be competent to contract for "supplies" or "services" for which a lien would attach in this state, there would seem to be no doubt that such a person may contract for "repairs" or "materials,"

and that a lien would vest therefor, provided, of course, that, tested by those general principles of admiralty law which are held to apply to domestic liens, it proves otherwise valid.

Counsel for claimants rely greatly upon The Samuel Marshall Case, 49 Fed. 754; Id., 4 C. C. A. 385, 54 Fed. 396. The opinions in that case contain a very satisfactory statement of the law of domestic liens, both in the decisions of the district judge and of the appellate tribunal (circuit court of appeals, sixth circuit); but upon a careful reading of the case I do not find anything inconsistent in the law, as there expounded, with that of the case at bar. The facts are of a different character, and this, of course, must be taken into consideration. In that case both the lower court and the appellate tribunal held that actual notice had been given to the supply man. In the case at bar no actual notice was given to the material men, nor am I able to find, from the evidence produced, that they were in possession of such facts as ought to have put them upon inquiry, or that their failure to be informed was due to carelessness or indifference. In the case of The Samuel Marshall the owner had no actual notice of the furnishing of the coal, and had, therefore, no opportunity of protecting himself by notifying the supply man. In the case at bar the owners were fully apprised of the fact that repairs were being made, and that materials were being furnished therefor. There, the coal for which a lien was claimed was something which the charterer was bound to furnish, and for which the owner received no direct benefit; here the owner derives some benefit in getting back an improved vessel. I do not allude to this last feature as constituting a distinguishing mark which would require the application of different principles of admiralty law, but simply to show that the facts of the Samuel Marshall Case are not analogous, in their main features, to the case at bar.

Capt. Rideout claims that the vessel, as a freight boat, has not been increased in value, although over $2,000 worth of repairs and alterations have been made. But this statement is flatly contradicted by other witnesses, entirely disinterested, so far as it appears, who say that the Alvira is a much better boat than she was before. Of course, it is to be remembered that the vessel is now fitted up as a passenger boat. Certainly, Capt. Rideout cannot be heard to object against this, for he himself consented to it, and, it seems, very willingly, as it is in evidence that the vessel had been unemployed for some months. A witness testified that she could be turned into a freight boat again, if desired, at an expense of about $100, and that she would be in a much better condition than she was prior to the repairs. Capt. Rideout says that it would require some $500, but, when asked to detail the items, he was unable to do so.

Taking into consideration all the facts and equities of this case, and the law applicable thereto, it is my opinion that the interveners are entitled to the process of this court to enforce the lien provided by section 813 of the Code of Civil Procedure of this state, and a decree for their several claims will be entered in their favor, with costs.